**UNITED STATES of America**

**v.**

**Thomas John MORRIS, Sr.**

**Crim. No. 99–00124–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 30, 1991.

Jonathan Shapiro, Jonathan Shapiro & Associates, P.C., Alexandria, Va., for defendant.

William H. Kenety, Nathan A. Neal, Trial Attys., Narcotic and Dangerous Drug Section, Washington, D.C., for U.S.

## MEMORANDUM OPINION

ELLIS, District Judge.

## INTRODUCTION

This matter came before the Court on defendant's motion for judgment of acquittal or a new trial and for sentencing. Defendant, Thomas John Morris, Sr., was convicted after a five-day jury trial on all counts of a four-count indictment for drug-trafficking crimes. Specifically, Count 1 charged Morris with conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846; Count 2 charged Morris with aiding and abetting the attempted possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1); Count 3 charged Morris with aiding and abetting the distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1); and Count 4 charged Morris with aiding and abetting the establishment of a drug manufacturing operation, in violation of 21 U.S.C. § 856.

For the reasons that follow, defendant's motion for judgment of acquittal or a new trial must be denied, and defendant is sentenced to concurrent terms of incarceration of one hundred and fifty-six (156) months on Count 1, sixty (60) months on Count 2, sixty (60) months on Count 3, and sixty (60) months on Count 4. Defendant is also sentenced to five years of supervised release upon his release from confinement and a punitive fine of $25,000.

## BACKGROUND FACTS

For twenty-five years, Morris, now sixty-three years old, practiced civil and criminal law in Northern Virginia. By all accounts, he was an able and distinguished practitioner. Sadly, late in his career, Morris succumbed to the temptations of crime. In 1984, he met Samuel Balbuena while representing Balbuena's mother in an unrelated civil case. Balbuena headed a massive drug-trafficking conspiracy responsible for distributing millions of dollars worth of marijuana, cocaine, and "crack" throughout the Washington, D.C., metropolitan area from 1983 to 1989. Beginning sometime after 1984, as the jury found, Morris participated in and furthered Balbuena's conspiracy in several ways.

In mid–1985, Balbuena secured Morris' legal representation for one of his drug couriers, who had been arrested transporting cocaine at National Airport in Northern Virginia. On this occasion, Balbuena described his drug operations to Morris. Approximately one month later, Balbuena consulted Morris about purchasing a boat (the "S.S. Argus") for $115,000 to smuggle marijuana from Columbia into the United States.[1] Morris, with knowledge of Balbuena's illegal purpose, instructed Balbuena to buy the boat by using a series of cashiers checks, each valued at less than $10,000, thereby avoiding notice of the transaction to the Internal Revenue Service. Morris further advised Balbuena to register the boat in a United States port to avert suspicion. The government later seized the S.S. Argus and its narcotics cargo on the high seas.

During the next three-and-one-half to four years, Morris provided ongoing advice to Balbuena regarding the conduct of his drug operations. This advice included methods of maintaining a lawful appearance and ways to avoid detection by law enforcement authorities. Among other acts, Morris knowingly formed "dummy"

1. At trial, Balbuena testified that this meeting took place August 1, 1985. Morris denies the occurrence of the meeting and maintains that trial evidence, in particular his 1985 day book, showed he was overseas on August 1, 1985. This contested issue is discussed in detail at A.1 and A.2.b below.

corporations through which Balbuena could launder drug proceeds, knowingly obtained fraudulent identities for Balbuena, and knowingly assisted Balbuena's drug runners in furthering their criminal activities. Eventually, a coconspirator became a government informer. The informer's information led to indictments of Balbuena and various of his coconspirators, including Morris.

Count 1 of the indictment against Morris encompassed his entire participation in the Balbuena conspiracy. Counts 2 through 4 charged particular overt criminal acts. Specifically, Count 2 charged Morris with a 1987 transaction in which he aided and abetted Balbuena in the attempted possession of large quantities of marijuana with intent to distribute. Balbuena had contracted to purchase fifteen tons of marijuana, but needed $50,000 to complete the deal. Coconspirator Pleasant "Pete" Lewis agreed to loan Balbuena the money in exchange for a promissory note. The verdict reflects the jury's conclusion that Morris prepared a promissory note with a twenty percent interest rate, knowing that Balbuena intended to use the loan proceeds to purchase the marijuana. The jury also found that Morris knew that Balbuena had signed the note using an alias and that Balbuena intended to defraud Lewis by defaulting on the debt.

Count 3 charged Morris with aiding and abetting the distribution of cocaine in connection with his representation of one of Balbuena's couriers, LaRue Harris. Harris was arrested while transporting large quantities of cocaine in Delaware. Thereafter, concerned about protecting the drug enterprise, Balbuena and Lewis visited Morris at his home. Trial testimony revealed that Morris advised them to bail Harris out promptly, to direct Harris to keep his mouth shut, and to spirit Harris out of town, if necessary. Morris, Balbuena, and Lewis then agreed that in order to raise Harris' bail money quickly, Balbuena would sell one-half kilogram of cocaine.

Finally, Count 4 charged Morris with aiding and abetting the establishment of a drug manufacturing operation by his knowing participation in the purchase of a drug "stash" house in Arlington, Virginia, in 1987. Coconspirator Pleasant Lewis and his wife Sharon were the original owners of the house. Sharon Lewis was having an affair with Balbuena and wanted to divorce her husband. Balbuena referred her to Morris. As part of a divorce settlement, Morris arranged for the transfer of title to the house from Pleasant and Sharon Lewis jointly to Sharon Lewis individually. Thereafter, Sharon Lewis had trouble maintaining the house and sought Balbuena's help. He promised to take title to the house and care for it until she could manage it herself. His true intentions were otherwise. He converted the house into a drug distribution center and operated it as such from approximately February to May 1987. The jury's verdict reflects its conclusion that Morris prepared the paperwork for Balbuena's acquisition of title to the house, knowing Balbuena intended to use it as a narcotics "stash" house. Balbuena evicted Sharon Lewis, who lost everything in the transaction. In May 1987, as compensation for services rendered to Balbuena, Balbuena transferred title to the house, then valued at $125,000, to Morris for $5,000 cash and assumption of an approximately $80,000 mortgage.

Following a five-day trial, on July 10, 1991, a twelve-member jury convicted Morris on all four counts. Sentencing was set for September 13, 1991. At that hearing, the Court, based on its review of the Pre-Sentence Investigation Report ("PSIR") and Morris' frail physical appearance, ordered further medical evaluations of Morris. The Court also directed Morris' counsel to submit a memorandum elaborating all bases for a downward departure. Sentencing was rescheduled for October 11, 1991, at which time the Court heard testimony of witnesses for both parties and argument by both counsel. Morris elected to forgo allocution, submitting instead a written statement.[2]

2. Morris' statement has been made a part of the PSIR.

ANALYSIS

A. *Judgment of Acquittal—New Trial*

The threshold matter is disposition of defendant's Motion for Judgment of Acquittal or, in the Alternative, a New Trial.

1. Judgment of Acquittal

Rule 29(a), Fed.R.Crim.P., provides, in pertinent part, that a court shall enter judgment of acquittal "if the evidence is insufficient to sustain a conviction" for the offense or offenses charged. The prevailing test for evaluating sufficiency of the evidence in the context of a motion for acquittal was enunciated by Judge Prettyman in *Curley v. United States,* 160 F.2d 229, 232–33 (D.C.Cir.), *cert. denied,* 331 U.S. 837, 67 S.Ct. 1512, 91 L.Ed. 1850 (1947):

> The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full pay to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or not reasonable doubt, is fairly possible, he must let the jury decide the matter.

This standard has been endorsed by the Supreme Court, *Jackson v. Virginia,* 443 U.S. 307, 319 n. 11, 99 S.Ct. 2781, 2789–90 n. 11, 61 L.Ed.2d 560 (1979), and widely adopted by other circuits, including the Fourth. *See, e.g., United States v. Sherman,* 421 F.2d 198, 199 (4th Cir.), *cert. denied,* 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970) ("In considering the sufficiency of the evidence we do not determine whether it convinces us of guilt beyond a reasonable doubt, but only that the evidence would permit the trier of fact to find the defendant guilty beyond a reasonable doubt." [citations omitted]); *United States v. McNatt,* 813 F.2d 499, 502 (1st Cir.1987) (propounding a "rational trier of fact" standard and stating that if evidence can support varying interpretations, the reviewing court should defer to the jury's verdict). In applying the *Curley* test, evidence must be viewed in the light most favorable to the government. *See Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *Sherman,* 421 F.2d at 199; *United States v. Sawyer,* 294 F.2d 24, 31 (4th Cir.), *cert. denied,* 368 U.S. 916, 82 S.Ct. 196, 7 L.Ed.2d 132 (1961). "Even the trial court, which has heard the testimony of witnesses first hand, is not to weigh the evidence or assess the credibility of witnesses when it judges the merits of a motion for acquittal." *Burks,* 437 U.S. at 16, 98 S.Ct. at 2150. Conflicting testimony does not necessarily create reasonable doubt and, by itself, is insufficient to support a judgment of acquittal. *See, e.g., United States v. Murray,* 527 F.2d 401, 410 (5th Cir.1976) (where witnesses differed on identification of defendant, the jury was free to believe the testimony of one and reject the testimony of another); *United States v. Luciano,* 343 F.2d 172, 173 (4th Cir.), *cert. denied,* 381 U.S. 945, 85 S.Ct. 1786, 14 L.Ed.2d 708 (1965) (jury had the right to believe as much as it thought proper of a witness' evasive, conflicting, severely impeached testimony). *See generally* 2 Wright & Miller *Federal Practice and Procedure* § 467 (discussing judgments of acquittal).

As grounds for his motion for acquittal, Morris attacks Balbuena's testimony. He claims Balbuena lied. In particular, Morris disputes Balbuena's testimony that the two discussed the S.S. Argus acquisition at a meeting in Morris' Wilson Boulevard office on August 1, 1985. Morris points to evidence in the record that suggests he was overseas at the time of the alleged meeting. Specifically, Morris contends that entries in his 1985 day book [3]

3. The day book has the pencilled notation "leave for London—return August 3" on July 12, 1985.

and airline ticket receipts conclusively prove he was in Britain attending an American Bar Association convention on August 1, 1985. Moreover, Morris maintains that trial evidence revealed he did not occupy the Wilson Boulevard office until mid-October 1985. Morris therefore concludes that Balbuena lied; furthermore, Morris insists that this falsehood reflects Balbuena's propensity for lying, and that this propensity infected his entire testimony and the jury's verdict. No jury, Morris charges, could have concluded beyond a reasonable doubt that Balbuena's account of the meeting was true.

Undoubtedly, Balbuena sometimes lies.[4] Yet even confirmed liars speak truthfully when it suits them. Substantial trial evidence exists from which a jury could reasonably have concluded that Balbuena testified truthfully at Morris' trial. Several witnesses, some openly hostile to Balbuena or with interests adverse to his, corroborated his testimony concerning Morris' role in the conspiracy. Moreover, it does not necessarily follow that the apparent contradiction between Balbuena's testimony and the day book entries proves that Balbuena perjured himself. An equally plausible interpretation of the evidence, viewed in the light most favorable to the government, is that the meeting occurred in sum and substance as Balbuena described it, but that he was simply and unintentionally mistaken as to its exact date and place. This equally plausible interpretation of Balbuena's testimony defeats Morris' attack on the verdict, for it is the province of the jury as the trier of fact to evaluate credibility of witnesses and weigh evidence. The jury was free to disbelieve Morris' evidence and believe Balbuena's testimony. *See Murray,* 527 F.2d at 410; *Luciano,* 343 F.2d at 173; *Curley,* 160 F.2d at 232–33. Where, as here, evidence supports differing reasonable interpretations, a court must defer to the jury's judgment. *See McNatt,* 813 F.2d at 502; *Curley,* 160 F.2d at 232–33. In this case, a reasonable jury, considering all of the evidence in the light most favorable to the government, might fairly have concluded beyond a reasonable doubt that Morris met with Balbuena to plan the S.S. Argus transaction and, further, that Morris participated in the Balbuena conspiracy in all of the ways described in this Memorandum Opinion. Accordingly, the Court finds there is sufficient credible evidence to sustain Morris' convictions on all counts and hence his motion, in so far as it relates to a judgment of acquittal, should be denied.

2. New Trial

Morris contends that a new trial must be granted because the government (1) suborned and condoned perjured testimony by Balbuena; (2) withheld or failed to pursue exculpatory evidence contained in the 1985 day book; and (3) failed to provide information concerning Balbuena's alleged continued illegal activity in Leavenworth prison. All are meritless claims.

"[I]n the interest of justice" is the standard for granting new trials under Rule 33, Fed.R.Crim.P. The meaning of "interest of justice" is largely a matter of discretion for the trial court depending on the circumstances of the case. Legal standards differ for motions for new trials based on the use of perjured testimony, nondisclosure of exculpatory material evidence, and newly discovered evidence. *See generally* 3 Wright & Miller *Federal Practice and Procedure* §§ 553–556 (discussing new trial motions). An overarching principle is that new trials should be granted sparingly. *See United States v. Arrington,* 757 F.2d 1484, 1485 (4th Cir.1985); *United States v. Leach,* 427 F.2d 1107, 1111 (1st Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59 (1970).

a. *Alleged Use of Perjured Testimony*

The inquiry into Morris' allegations of prosecutorial use of perjured testimony must begin with a determination of whether Balbuena's testimony was, in fact, per-

Pencilled diagonal lines cover the pages until August 3. A notation in ink on July 25 indicates a matter in Arlington Circuit Court.

4. For example, at one of Balbuena's sentencing hearings, this Court expressed its view that his allocution was untruthful.

jured. For the reasons set forth below, the Court is not persuaded that Balbuena perjured himself in any material respect at Morris' trial. Hence, a new trial on the ground of use of perjured testimony is not warranted.[5]

Several reasons point persuasively away from perjury. First, as previously discussed, inconsistencies between Balbuena's testimony and Morris' day book, by themselves, do not establish that Balbuena testified untruthfully. Second, the essential damning elements of Balbuena's testimony about Morris' role in the conspiracy were abundantly corroborated by other witnesses, some of whom had ample motive to harm Balbuena, not help him. Third, no credible, convincing evidence before this Court shows that Balbuena specifically lied about his August 1985 meeting with Morris, his activities at Leavenworth,[6] or the circumstances of his introduction to Maryland attorney Gil Cochran.[7] The Court is simply not satisfied that Balbuena's testimony was perjured. The fact that Balbuena was a reputed liar and a drug-dealer does not establish that he was incapable of telling the truth. Liars do not invariably lie. Lastly, Morris's counsel cross-examined Balbuena thoroughly; he was accorded ample opportunity to expose and exploit any testimonial conflicts. That Balbuena's testimony may have conflicted with other testimony and evidence simply required the jury to exercise its prerogative to evaluate the credibility of witnesses and to weigh evidence.

b. *Failure to Investigate the Day Book Entries*

It is well-established that the prosecution's failure, upon defendant's request, to disclose evidence that is favorable to a defendant and material to the issue of guilt or punishment violates a defendant's due process rights. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Both exculpatory and impeachment evidence fall within the *Brady* rule. *Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380; *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Disclosure is required only for material evidence. *Bagley,* 473 U.S. at 677, 105 S.Ct. at 3381. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." 473 U.S. at 682, 105 S.Ct. at 3383.

Morris made a timely general request for *Brady* material. In responding to that re-

5. Having concluded that Balbuena testified truthfully in all material respects at Morris' trial, the Court need not and does not reach the issue of the appropriate standard to apply to new trial motions based on either knowing or innocent prosecutorial use of perjured testimony. *Cf. United States v. Wallace,* 528 F.2d 863, 866 n. 3 (4th Cir.1976) (invoking, in a case involving recanted testimony, the test set forth in *Larrison v. United States,* 24 F.2d 82 (7th Cir.1928), but limiting its decision to the circumstances presented in the case).

6. As discussed at A.2.c below, Morris charges that Balbuena lied about the nature and extent of criminal activities he allegedly conducted while an inmate at Federal Correctional Institute, Leavenworth.

7. Morris claims that Balbuena's trial testimony concerning the circumstances of Balbuena's introduction to Gil Cochran was contradicted by the testimony of other prosecution witnesses. In this regard, Balbuena stated that Morris referred him to Cochran following LaRue Harris' arrest. Another key government witness, Frederick Daumit, testified that he obtained Cochran's name from a friend. Cochran testified that the LaRue Harris case was referred to him by an attorney he knew. Morris speculates that this second attorney was Daumit's friend. From this, Morris again concludes that Balbuena lied; he contends that contradictory testimony of two key government witnesses should have "raised red storm flags" with respect to Balbuena's credibility. This claim is unpersuasive. Inconsistencies between testimony of two witnesses, without more, do not establish that testimony was perjured or that the prosecution knew or should have known it was perjured. But of course, testimonial inconsistencies may well raise red storm flags in the minds of the jurors, the proper arbiters of witness credibility. And defendant was certainly free to argue his views concerning Balbuena's credibility to the jury and did so unsuccessfully.

quest, the government did not disclose the contents of the 1985 day book, which it had seized in November 1988. Morris maintains that this omission requires a new trial because the contents of the day book, which purport to prove he was in Britain at the time Balbuena claimed to have met with him about the S.S. Argus, are exculpatory as to Morris, impeaching as to Balbuena, and material to the issue of guilt. Morris further claims that the government improperly failed to investigate and corroborate the accuracy of the day book entries indicating the alleged trip abroad. Morris asserts that corroborating evidence, if any were to have been discovered, would have exculpated Morris. These arguments are unpersuasive.

The record reflects that Morris had ample access to all relevant information he needed to construct his defense on this issue, including the day book and airline ticket receipts.[8] Morris knew, or should have known, all of the essential facts of the claimed exculpatory evidence, and thus the government had no obligation to develop or produce additional evidence. *See United States v. Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397 (*Brady* applies where evidence, discovered after trial, was known to the prosecutor, but unknown to the defense); *United States v. Grossman,* 843 F.2d 78, 85 (2nd Cir.1988), *cert. denied,* 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989) (exculpatory evidence need not be disclosed if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence); *United States v. Gaggi,* 811 F.2d 47, 59 (2nd Cir.), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987) (same); *Nassar v. Sissel,* 792 F.2d 119, 121 (8th Cir.1986) (*Brady* limited to information known to prosecution, but unknown to defendant). Morris had access to the day book in advance of trial and was at liberty to use its contents in any way he chose. At trial, Morris challenged Balbuena's version of the S.S. Argus meeting; the issue was hotly contested. In the end, the government prevailed. The day book evidence fails the *Bagley* materiality test; there is no reasonable probability that the result of the trial would have been different if the government had disclosed the contents of the day book to Morris. Morris had access to the day book, knew its contents, and argued them to the jury unsuccessfully. Hence, no new trial is warranted on this ground.

c. *Balbuena at Leavenworth*

Balbuena arrived at Federal Correctional Institute, Leavenworth in February 1991. Thereafter, he purportedly became involved in illegal activities. Specifically, an investigation by Leavenworth officials in early June 1991 revealed that in or about April 1991, Balbuena fraudulently obtained money from other prisoners for whom he promised to obtain drugs; apparently, he later reneged on the deal. This was discovered by prison officials after displeased inmates set fire to a mattress in Balbuena's cell. In late April, several days after the fire, Cassandra Paula Gomez provided government agent Gary Simone with information concerning Balbuena's scam drug deal at Leavenworth. Approximately June 24th or 25th, a week before Morris' trial, the prosecution provided Morris with copies of Agent Simone's notes dated April 30, 1991, the June investigation report by the Leavenworth officials, and a two paragraph *Jencks/Giglio* memorandum, dated June 25, 1991. It is undisputed that this disclosure was timely. At Morris' trial, Balbuena testified that his involvement with drugs at Leavenworth had been limited and that he had been coerced or compelled by other inmates to introduce drugs into the facility. Ms. Gomez testified that she had received $10,000 as part of Balbue-

8. During the week following Morris' arraignment on April 8, 1991, Morris' counsel twice visited the Department of Justice and physically reviewed all of the records seized from Morris' office, including the day book. On one occasion he was accompanied by Morris, on another by Morris' wife. The records were reviewed in a private, empty office without any government personnel present. In addition, the defense had access to the records throughout the pretrial period of the case. In fact, on one occasion, a government attorney personally brought records to Morris' counsel's office for review.

na's scam, but did not know the source of the money. Morris now claims to have discovered new evidence, in the form of testimony from unidentified federal prisoners, proving that Balbuena operated a large-scale drug ring inside Leavenworth and that Gomez knew this and knew that this was the source of the $10,000.[9] Morris claims this evidence shows Balbuena and Gomez perjured themselves at his trial. Moreover, Morris claims Balbuena operated his alleged drug ring with the acquiescence and protection of the government. The government denies these charges and insists that its knowledge of illicit activity by Balbuena at Leavenworth is limited to the incident set forth in the information disclosed to Morris before the trial.

The applicable test for a motion for a new trial premised on newly discovered evidence is the five-part test set forth in *Mills v. United States,* 281 F.2d 736, 738 (4th Cir.1960):

> (a) [t]he evidence must be, in fact, newly discovered, i.e. discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*See also United States v. Dworkin,* 116 F.R.D. 29, 31 n. 2 (E.D.Va.1987) (recognizing the *Mills* test for new trial motions based on newly discovered evidence); *United States v. Yosuf,* 508 F.Supp. 24, 27 (E.D.Va.1980) (supplementing the *Mills* test by considering, in addition to the five *Mills* factors, the extent of exploration of the witness' credibility at trial and any denials by the witness that his or her trial testimony was false). In *Yosuf,* Judge Clarke, canvassing authority where a new trial was granted because of newly discovered impeaching evidence, concluded that in all such cases "the impeaching evidence was clear and uncontradicted, and substantially affected the credibility of a key witness." *Id.* at 27. Judge Clarke also noted that where the prosecution and defense have had ample opportunity to explore the credibility of a key prosecution witness, absent suppression of evidence by the prosecution, appellate courts have consistently upheld decisions denying new trials. *See United States v. Zane,* 507 F.2d 346 (2nd Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1563, 43 L.Ed.2d 775 (1975); *United States v. Trapnell,* 495 F.2d 22 (2nd Cir.), *cert. denied,* 419 U.S. 851, 95 S.Ct. 93, 42 L.Ed.2d 82 (1974); *United States ex rel. Rice v. Vincent,* 491 F.2d 1326 (2nd Cir.), *cert. denied,* 419 U.S. 880, 95 S.Ct. 144, 42 L.Ed.2d 120 (1974). "Although a new trial generally must be ordered when a court is convinced that the testimony of a material witness is perjured [citations omitted], newly discovered evidence, whose only effect is to contradict or attack the credibility of witnesses, will not warrant a new trial, in the absence of very unusual or extraordinary circumstances [citations omitted]." *Yosuf,* 508 F.Supp. at 26.

Morris' new evidence, even assuming its existence, falls far short of the *Mills* test. At best, testimony of Leavenworth inmates regarding Balbuena's criminal endeavors would be merely cumulative impeachment evidence. Balbuena's credibility was extensively explored at trial. Morris had ample evidence at the time of trial regarding Balbuena's criminal history and convictions. No record evidence shows that Balbuena operated a large-scale drug ring in prison or that the government knew of, or condoned, any such drug distribution activities. Moreover, evidence of Balbuena's

9. In particular, Morris claims that one inmate would testify that Balbuena used the telephone daily while at Leavenworth to transact drug deals and that Balbuena arranged for drugs to be imported into the prison. The government, in its brief, represents that neither the prosecutor, Leavenworth officials, nor the Bureau of Prisons has knowledge of any drug-related activity by Balbuena other than the scam transaction detailed in the June report provided to Morris before trial. The government speculates that inmates now providing information to Morris may have been victims of Balbuena's scam. Morris presents no affidavits or other evidence from these unidentified prisoners. No evidence is before the Court from which it can evaluate the allegations of these inmates.

purported Leavenworth activities is only collateral to the issues raised at Morris' trial. On those issues, even witnesses hostile to Balbuena corroborated his testimony. It is not probable that the jury, had it concluded Balbuena lied about the nature or extent of his own activities at Leavenworth, would have acquitted Morris.

For all of the above reasons, Morris' motion for a new trial should be denied.

B. *Use of the Marijuana Seized from the S.S. Argus in 1985 in Calculating Morris' Offense Level*

Morris contends that it is improper to charge him with the 31,280 pounds of marijuana seized in 1985 from the S.S. Argus for purposes of calculating his offense level under the federal Sentencing Guidelines (the "Guidelines"). This contention flies in the face of the Guidelines, which provide that relevant conduct for calculating an offense level includes

> all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense.

U.S.S.G. § 1B1.3(a)(1). Application Note 1 explains that the phrase "for which the defendant would be otherwise accountable" in the above passage "includes conduct that the defendant counseled, commanded, induced, procured, or willfully caused." U.S.S.G. § 1B1.3, Note 1. Significantly, conduct for which a defendant is "otherwise accountable" includes conduct of co-conspirators "in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." *Id.*

Trial evidence showed that Morris concocted a scheme to use multiple cashiers checks to pay for the vessel, S.S. Argus, which he knew Balbuena planned to use to import drugs. The plan was hatched at the early August 1985 meeting between the two coconspirators. Record evidence amply supports a jury finding beyond a reasonable doubt that the 1985 meeting between Morris and Balbuena occurred and that the purchase of the S.S. Argus was planned at that meeting. The government met its burden of showing that by aiding and abetting the purchase of the boat Morris counseled or induced the S.S. Argus drug trafficking transaction. Moreover, Morris actually knew or could reasonably have foreseen that the ship would be used to smuggle large quantities of drugs. Hence, under § 1B1.3, Morris' offense level properly included the quantity of marijuana seized from the S.S. Argus. Morris' objection must therefore be overruled.

C. *Duration of the Conspiracy (Count 1)*

Congress, in 1987, amended the language of 21 U.S.C. § 846, so as to mandate a ten year mandatory minimum sentence for conspiracy to traffick in drugs.[10] This amendment became effective on November 18, 1988. Morris asserts that this statutory minimum sentence does not apply to him, because the conspiracy underlying his conviction on Count 1 terminated as to him prior to this date. Specifically, Morris contends that the conspiracy terminated when Balbuena was arrested on November 13, 1988. At approximately the same time, Morris entered the hospital for treatment of lung cancer. The government counters that evidence of Morris' continuing concealment of the conspiracy and his intention to testify on behalf of Balbuena at Balbuena's trial indicates that the conspiracy continued

**10.** Count 1 charged defendant with conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846. Section 846, as amended, reads:

> Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

The underlying offense in this case is governed by 21 U.S.C. § 841(a)(1). Section 841 provides for a mandatory minimum ten year sentence. Accordingly, Morris would be subject to the ten year minimum prescribed in § 841, if the amended § 846 applied to his case.

beyond November 18, 1988, and thus that Morris is subject to the statutory minimum sentence.

The mere act of continuing to conceal a conspiracy, without more, is insufficient to constitute continuation of the original conspiracy. Concealment in order to achieve the central purpose of a conspiracy differs from concealment intended solely to cover up an already executed crime. *Grunewald v. United States,* 353 U.S. 391, 413–15, 77 S.Ct. 963, 978–79, 1 L.Ed.2d 931 (1957). The former continues the conspiracy; the latter does not. *Id. Grunewald* involved a conspiracy to defraud the United States by obtaining "no prosecution" rulings from the Internal Revenue Service. Justice Harlan held that

> overt acts are meaningful only if they are within the scope of the conspiratorial agreement. If that agreement did not, expressly or impliedly, contemplate that the conspiracy would continue in its efforts to protect the taxpayers in order to immunize them from tax prosecution, then the scope of the agreement cannot be broadened retroactively by the fact that the conspirators took steps after the conspiracy which incidentally had that effect.

353 U.S. at 414, 77 S.Ct. at 979. This principle is dispositive here. To prove that Balbuena's conspiracy continued as to Morris beyond Balbuena's arrest on November 13, 1988, the government must show that Morris' actions of concealment were within the scope of a conspiratorial agreement and not actions which only incidentally had the effect of protecting the conspiracy. More specifically, the government must produce direct evidence that the conspirators originally expressly agreed to conceal the conspiracy and that Morris' actions furthered that purpose. *See United States v. Steele,* 685 F.2d 793, 803 (3rd Cir.), *cert. denied sub nom. Mothon v. United States,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982) (applying evidentiary burdens set forth in *Grunewald* to require prosecution to show direct evidence of (1) an original express agreement to conceal the conspiracy and (2) an overt act that furthered the conspiratorial purpose). It has not done so. Furthermore, the government has not shown any overt criminal acts furthering the purpose of the conspiracy or furthering concealment of the conspiracy between Morris and any of the coconspirators after the date of Balbuena's arrest: no meetings, no phone calls, no illicit legal advice.[11] Morris concealed the conspiracy to protect his own interests and avoid prosecution, not to further the activities of the drug network. His act of self-preservation cannot fairly be said to have resulted from an agreement to further Balbuena's conspiracy.

As a second theory in support of its contention that the conspiracy continued beyond Balbuena's arrest, the government asserts that Morris volunteered to testify for Balbuena at Balbuena's trial. In this regard, the government offered testimony of two Drug Enforcement Agency agents regarding recent conversations they had with Balbuena's attorney, Lloyd Sammons. According to the agents, Sammons told them that Morris volunteered to testify for Balbuena and that Sammons declined to have Morris take the stand when Morris later seemed reluctant to testify. The government did not introduce direct testimony from Sammons. Nor did the government introduce any evidence that testifying on behalf of Balbuena was, expressly or impliedly, within the scope of the conspiratorial agreement. On this point, Morris took the stand in his own defense. He testified that Sammons subpoenaed him to testify, that he had no contact with Sammons until he appeared at the courthouse on the day of Balbuena's trial, and that Sammons chose not to call Morris when informed that Morris would testify that Balbuena had forged Morris' name on a pleading.

11. The only evidence of any contact after Balbuena's arrest between Morris and any coconspirator was Morris' own testimony that there might have been a single phone call from Balbuena after his arrest seeking advice about taking a polygraph. Morris was uncertain whether the phone call occurred, and no evidence was presented to corroborate it. This falls far short of the requisite showing.

The government, bearing the burden of proof on the issue of the existence and continuation of the conspiracy, *Steele,* 685 F.2d at 803, has not carried this burden; it has not proved that as to Morris the conspiracy continued until November 18, 1988, the effective date of the mandatory minimum statute.[12] Rather, the record reflects that the conspiracy terminated on November 13, 1988.[13] Consequently, the mandatory minimum does not apply to Morris with respect to Count 1. *See United States v. Campbell,* 704 F.Supp. 661 (E.D.Va.1989) (interpreting the pre-November 1988 amendment language of § 846 as not mandating imposition of a mandatory minimum sentence). *See also United States v. Geer,* 923 F.2d 892, 898 (1st Cir.1991) (citing *Campbell* with approval); *United States v. Vinson,* 886 F.2d 740, 741, n. 1 (4th Cir. 1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990) (same). Morris' objection on this ground must therefore be sustained.[14]

D. *The Preston Issue (Counts 2 and 3)*

Morris urges that decisions in *United States v. Preston,* 739 F.Supp. 294 (W.D.Va.1990), and *United States v. Jones,* 902 F.2d 1152 (4th Cir.1990), indicate that the statutory language of 21 U.S.C. § 841(b)(1)(A) gives courts discretion to impose a fine in lieu of a prison term. In *Jones,* the Fourth Circuit concluded that the plain language of 21 U.S.C. § 844 authorized judges to impose either a fine, a term of incarceration, or both. 902 F.2d at 1153–1154. At that time, the pertinent part of the statute read:

> a person convicted under this subsection ... shall be fined under Title 18, *or* imprisoned not less than 5 years and not more than 20 years, *or* both.... (emphasis added).

*Id.* at 1153. The *Jones* panel noted that in the absence of clear legislative intent, the plain language of a statute is conclusive. 902 F.2d at 1153. In that panel's view, the unambiguous use of the disjunctive "or" meant that any one of the three alternatives could be imposed, including the fine alone.[15] Similarly, the court in *Preston* held that a judge could elect to impose only a fine under § 841(b)(1)(A), which reads:

> ... any person who violates subsection (a) of this section shall be sentenced as follows:
>
> such person shall be sentenced to a term of imprisonment which may not be less than 10 years ..., a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, ..., or both.

21 U.S.C. § 841(b)(1)(A). 739 F.Supp. at 300–03. The *Preston* court, following *Jones,* interpreted this language as permitting judges to impose either (1) a prison term, (2) a fine, or (3) both a prison term and fine. *Id.*

*Preston* is unpersuasive. It ignores § 841's overall structure. Significantly,

12. The government correctly points out that the arrest of one coconspirator does not necessarily end the conspiracy with respect to other coconspirators. *See United States v. Grubb,* 527 F.2d 1107, 1109 (4th Cir.1975). Yet, the government incorrectly argues that the relevant inquiry in this case is whether Morris affirmatively withdrew from the conspiracy after Balbuena's arrest. This argument presupposes that a conspiracy continued to exist after Balbuena's arrest from which Morris was obligated to withdraw. The government initially bears the burden on the issue of the existence and continuation of the conspiracy. *See Steele,* 685 F.2d at 803. Only after the government has carried that burden does the burden shift to the defendant to produce evidence of affirmative acts of withdrawal. *See United States v. West,* 877 F.2d 281, 289 (4th Cir.), *cert. denied,* 493 U.S. 869, 110 S.Ct. 195, 107 L.Ed.2d 149 (1989); *United States v. Gibbs,* 813 F.2d 596, 602 (3rd Cir.), *cert. denied,* 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987).

13. The judgment originally entered in this case contained a clerical error indicating that the Count 1 offense ended in February 1989. Counsel for Morris alerted the Court to this error and requested a correction. Accordingly, without objection by the government, the Court amended the judgment to reflect that the conspiracy ended on November 13, 1988.

14. In any event, the sentence ultimately imposed on this count exceeds the mandatory minimum, a result that effectively moots this issue.

15. Congress subsequently revised this language to clarify that a fine could not be imposed in lieu of incarceration. 21 U.S.C. § 844(a).

§ 841(b)(1)(A) provides that "any sentence" imposed must include a term of supervised release. Yet under 18 U.S.C. § 3583, a "term of supervised release" can only follow a term of imprisonment, not a fine alone. It follows that if any sentence imposed must include supervised release, any sentence imposed must also include imprisonment. Furthermore, the statute provides that "[n]o person sentenced under this subparagraph shall be eligible for parole *during the term of imprisonment imposed therein.*" § 841(b)(1)(A) (emphasis added). This proscription presumes that all persons sentenced under the statute will receive a prison term. Moreover, unlike *Jones,* Congressional intent that persons convicted under the statute serve mandatory prison terms is clear from both the legislative history, *see, e.g.,* 132 Cong. Rec. § 14301 (daily ed. Sept. 30, 1986) (statement of Senate Minority Leader Robert Byrd that "the law we pass will henceforth make it abundantly clear that a jail term must be imposed and must be served"), and the statutory scheme itself. Because imposition of a fine in lieu of incarceration contradicts both the legislative intent and the overall scheme of § 841, courts have no statutory authority under § 841(b)(1)(A) to impose only a fine. At a minimum, courts must impose a prison term, which may be accompanied, at the courts' discretion, by a fine.[16] Thus, Morris' objection to the contrary is meritless.

E. *Five-Year Mandatory Minimum Sentence for Count 3*

21 U.S.C. § 841 establishes a mandatory minimum sentence of five years for the distribution of one-half kilogram of cocaine. Morris contends, however, that this mandatory minimum sentence does not apply in his case because the charged offense occurred before the effective date of the mandatory minimum provisions. Absent clear direction by Congress to the contrary, a law becomes effective upon enactment. Thus, the minimum mandatory provisions became effective on October 27, 1986, the date of enactment of the statutory amendments. *See United States v. Gozlon–Peretz,* — U.S. ——, ——, 111 S.Ct. 840, 846, 112 L.Ed.2d 919 (1991) (the section of the Anti–Drug Abuse Act requiring term of supervised release became effective on the date of enactment, October 27, 1986); *United States v. Duprey,* 895 F.2d 303, 311 (7th Cir.1989), *cert. denied,* 495 U.S. 906, 110 S.Ct. 1927, 109 L.Ed.2d 291 (1990) (sentence provisions applicable to federal offenses become effective immediately upon enactment on October 27, 1986); *United States v. Meyers,* 847 F.2d 1408, 1415 (9th Cir.1988) (penalty provisions of the Narcotics Penalties and Enforcement Act of 1986 became effective immediately on October 27, 1986). The events precipitating Morris' conviction on Count 3 occurred on or about May 30, 1987. Since the offense conduct occurred after enactment of the minimum sentence provision, the Court must impose at least the five-year mandatory minimum sentence of imprisonment with respect to Count 3. Morris' objection in this regard must therefore be overruled.

F. *Sentencing Conclusions*[17]

1. Morris' adjusted offense level is 38.[18]
2. Morris' total offense level is 38.

16. In any event, the Court notes that, in light of the gravity of the offenses committed by Morris, a sentence that does not include a lengthy period of incarceration would be inappropriate. Thus, even assuming that the Court had discretion to impose a sentence limited to a fine, it would not do so. Rather, it would impose the sentence ultimately issued.

17. With the exception of the matters noted above, neither the government nor Morris objects to the PSIR, as amended on September 4, 1991. Accordingly, with the exception of the contested matters discussed above, the Court adopts the findings and conclusions of the amended PSIR as its findings and conclusions in this sentencing proceeding.

In addition, with the parties' concurrence, the Court orders that the figures set forth in the PSIR at paragraph 56 on page 11 are revised to reflect that Morris' net profit is $438.58; his monthly income is $8,079.01; and his net monthly cash flow is –479.51.

The Court also directs that the following letters submitted in support of Morris be made a part of the PSIR:

Letter dated July 19, 1991, from Karl G. Sorg, Esq.;

Letter dated July 31, 1991, from Joe Duvall, Esq.;

Letter dated July 31, 1991, from Monte Davis, Vice President of Central Fidelity Bank;

See footnote 18 on p. 441.

3. Morris' Criminal History Category is I.
4. The range of punishment under the Guidelines is 235 months to 293 months, with five (5) years of supervised release required.
5. The Guidelines range of fines is $25,000 to $250,000, with an additional statutory special assessment of $50.00 per count. 18 U.S.C. § 3013(a)(2)(A).
6. Probation is not authorized.

G. *Motion for Downward Departure*

Morris moved for a downward departure on five grounds: (1) age and infirmity; (2) service to community; (3) aberrational nature of the incident; (4) proportionality; and (5) the combined effect of the first four factors.

The goal sought by the architects of the federal Sentencing Guidelines is "an effective, fair sentencing system." U.S.S.G. Ch. 1, Pt. A3. Congress enacted the Sentencing Guidelines to remedy perceived inequities in sentencing; to import honesty, proportionality, and uniformity into sentencing decisions; and to bolster public confidence in the fair and just administration of justice. *See* U.S.S.G. Ch. 1, Pt. A3; *see also* 18 U.S.C. § 3553. Section 3553(a)(6) specifically directs sentencing judges to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See also United States v. Daly,* 883 F.2d 313, 319 (4th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 2622, 110 L.Ed.2d 643 (1990) (recognizing that the Sentencing Reform Act contemplated use of § 3553 departure power to remedy unwarranted sentence disparities among defendants with similar records convicted of similar conduct). As the Sixth Circuit put it, the Guidelines reflect

> a sentencing scheme designed to eliminate unreasoned disparity among similarly situated offenders. However, the key word is 'unreasoned.' Disparity in sentencing among criminal co-actors is not, *per se,* unlawful, or even necessarily undesirable. It is illogical, unjust, and unwarranted disparity that Congress' policy of sentence uniformity is intended to displace.

*United States v. Nelson,* 918 F.2d 1268, 1272 (6th Cir.1990) (holding that it was not unreasoned disparity for criminal coactors to receive different sentences where one had cooperated with authorities and one had not).

Morris relies on two sections of the Guidelines as bases for his departure motion. The first is § 5H1.1, which states that age "may be a reason to go below the guidelines when the offender is elderly *and* infirm and where a form of punishment (*e.g.* home confinement) might be equally efficient as and less costly than incarceration." U.S.S.G. § 5H1.1. The second is § 5K2.0 which provides, in relevant part:

> Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there

Letter dated August 2, 1991, from John J. Andrichak and Ellen L. Andrichak;
Letter dated August 13, 1991, from Gladys L. Fishel, Esq.;
Letter dated August 16, 1991, from Helen Morris Swingle;
Letter dated August 19, 1991, from John C. Youngs, Esq.;
Letter dated August 22, 1991, from Christopher George Applegate;
Letter dated September 6, 1991, from Anne A. Strope and Christopher Strope;
Letter dated September 6, 1991, from Carl G. Womack, Jr., Esq.;
Letter dated September 19, 1991, from Edward J. Slattery, III;
Letter dated October 1, 1991, from John E. Kilcarr, Esq.;
Letter dated October 5, 1991, from Ruth Morris Tumolo; and
Letter dated October 10, 1991, from Morris.
The Court further orders that this Sentencing Memorandum be appended to, and made part of, the PSIR, pursuant to Rule 32(c)(3)(D), Fed.R.Crim.P.

18. The Guidelines levels and ranges have been calculated using the Guidelines Manual in effect at the time the Count 1 offenses occurred. Counts 2, 3, and 4 are not Guidelines offenses.

exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

U.S.S.G. § 5K2.0. The question this Court must address under § 5K2.0 is whether any of the grounds asserted by Morris are of a kind or degree not adequately taken into consideration by the Sentencing Commission.

A review of the medical evaluations of Morris reveals that he suffers from severe depression and that he has a considerable history of serious illness. Nevertheless, he does not now suffer from any life-threatening illness, nor any condition which cannot be adequately monitored or treated in prison. The Court therefore declines to depart on account of Morris' age and health pursuant to § 5H1.1. Abundant evidence exists of Morris' significant community service, but the Court concludes that this, too, is an insufficient basis for departure. The Court also concludes that Morris' crimes were not the result of aberrational conduct as that concept is interpreted in this circuit. *See United States v. Glick,* 946 F.2d 335, 338 (4th Cir.1991) ("Because of the extensive planning, number of actions involved, and length of time over which Glick planned and perpetrated his offense, his actions do not constitute a single act of aberrant behavior.").

On the issue of proportionality, however, Morris' motion is persuasive. Morris' offense level of 38 yields a sentencing range of 235 to 293 months,[19] a disproportionately harsh result in view of the sentences imposed on his coconspirators. For example, kingpin and ring-leader Balbuena received a 360 month sentence, which was subsequently reduced to 252 months as a consequence of his cooperation with the government. The low end of Morris' sentencing range, 235 months, is barely less than Balbuena's ultimate sentence. Yet Morris is clearly less culpable than Balbuena, even taking Balbuena's cooperation into account. Similarly, Whalid Ahmed Abuelhawa, one of Balbuena's chief lieutenants, received a sentence of 188 months on three counts of a fifty-three count indictment relating to the conspiracy and drug possession. Anna Balbuena, one of the conspiracy's principal players, was sentenced to 150 months for three drug distribution-related counts. Morris is less culpable than Abuelhawa and Anna Balbuena, both of whom were directly, personally, and primarily involved with the purchase, possession, and distribution of narcotics.[20] Morris' involvement in the conspiracy, although undeniably serious, consisted of the criminal use and manipulation of his legal expertise; no evidence shows that Morris himself purchased, distributed, or used drugs or had any primary responsibility for these day-to-day activities within the conspiracy. Nor does it appear that he profited greatly from his role.[21]

The disparity in sentencing ranges ensues because Morris was one of the last of more than two dozen coconspirators indicted and tried.[22] In drug conspiracy cases, those who plead guilty early on and cooperate with the government typically are not charged with any new information learned later about the scope or activities of the conspiracy. This is especially true with respect to information regarding quantities of drugs involved in the conspiracy. Early on, this information is generally unknown to investigators. As a result, early pleaders are not typically charged with the total amount of drugs acquired or distributed by the conspiracy. Quantity of drugs involved

19. This range is derived from the Guidelines in effect at the time of the offense conduct. When originally calculated under current Guidelines, Morris' offense level of 44 placed him in the thirty-years-to-life range of sentences.

20. On the other hand, Morris is more culpable by some amount than Norvel Ferguson, who was sentenced to 128 months for one count of conspiracy to distribute cocaine. He is also more culpable than others previously given lower sentences.

21. The PSIR states that Morris acquired the bulk of his income through legitimate sources.

22. As of the date of Morris' sentencing, twenty-five individuals had been sentenced in connection with the Balbuena drug conspiracy.

in a conspiracy is a key component in the calculation of sentencing ranges under the Guidelines. *See* U.S.S.G. § 2D1.1. Thus, in terms of punishment, those caught early often do not bear the brunt of the full conspiratorial enterprise. Consequently, their sentences are lighter, both as a result of their cooperation and as a result of the fact that the full scope of the drug-trafficking may not yet have been uncovered. On the other hand, the full weight of the conspiracy usually falls on those apprehended late in the government's investigation, when more is known about a conspiracy and the nature and quantity of the drugs distributed. These latecomers are subject to harsher sentences, especially when they do not cooperate. As a general rule, sentence disparity between those who cooperate and otherwise similarly situated codefendants who do not cooperate is appropriate. In some circumstances, however, cooperation does not adequately account for sentence disparities, and such disparities may simply be unwarranted.

This is true in Morris' case. He was the last coconspirator prosecuted. By that time, the government had acquired a full and complete picture of the scope and structure of the conspiracy, including the amount of drugs involved. Moreover, some more culpable coconspirators, such as Anna Balbuena and Abuelhawa, did not cooperate, yet received sentences below Morris' sentencing range. The disparity in this case between Morris and his coconspirators is plainly "illogical, unjust, and unwarranted." *Nelson,* 918 F.2d at 1272. It follows, not from any reasoned governmental practice, *see United States v. Stanley,* 928 F.2d 575 (2nd Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991) (no unwarranted disparity resulted from prosecutor's plea bargaining practices that resulted in defendants who had engaged in similar conduct being charged with different offenses); *United States v. Foote,* 898 F.2d 659 (8th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 112, 112 L.Ed.2d 81 (1990) (prosecutorial practice relating to charging under 28 U.S.C. § 924(c) not a valid basis for departure), but from the unpredictable unfolding of a conspiracy investigation. Simply put, the disparity results from a factor not adequately considered by the Sentencing Commission: the happenstance inherent in drug conspiracy investigations and prosecutions. Furthermore, in this case the disparity exists to an extreme and unwarranted degree. That Morris should be subject to potentially harsher penalties than kingpin Balbuena is palpably inappropriate and contrary to the fundamental purposes of the Sentencing Guidelines.

The recent Sixth Circuit case, *United States v. Gessa,* 944 F.2d 265 (1991), *rehearing en banc granted and opinion vacated* (Nov. 8, 1991), is similar, but distinguishable. There, the district court departed downward on the basis of a perceived lack of proportionality between the sentences of codefendants. As calculated by the probation officer, Gessa's offense level included 2,500 kilograms of cocaine that had not been included for other conspirators, who had been prosecuted before the government had developed sufficient evidence to establish that the conspirators intended to import the 2,500 kilograms of cocaine. The district court, despite finding by a preponderance of the evidence that the 2,500 kilograms of cocaine had been a subject of the conspiracy, chose to depart downward by declining to include the 2,500 kilograms of cocaine in the defendant's "relevant conduct" for sentencing purposes. A Sixth Circuit panel initially vacated Gessa's sentence, holding that the sentencing judge had impermissibly ignored U.S.S.G. § 1B1.3(a)(2), which requires that the entire amount of drugs attributable to a conspiracy be used to establish the base offense level for sentencing. 944 F.2d at 269. That opinion has been vacated and a rehearing en banc has been granted, but the results of the rehearing have not yet been reported.

Even if the Sixth Circuit en banc adheres to the result reached by the panel, the case at bar is distinguishable. Although the facts of *Gessa,* in so far as they involve similarly situated codefendants facing disparate sentences due to the timing of their prosecutions, are strikingly similar to those

presented here, the district there did not ground its decision, as this Court has, on a specific factor not adequately considered by the Sentencing Commission. The district court there did not base its decision on U.S.S.G. § 5K2.0, as this Court does. There, in order to depart, the sentencing judge disregarded the mandate of U.S.S.G. § 1B1.3(a)(2); here, this Court strictly follows that section. Morris' base offense level included the full amount of the drugs attributable by a preponderance of the evidence to the conspiracy. Moreover, the departure in this case is not based solely on this Court's perception of a lack of proportionality between the sentences of codefendants. *See United States v. Carr,* 932 F.2d 67, 73 (1st Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 112, 116 L.Ed.2d 82 (1991) ("The district court's individual beliefs as to proportionality and uniformity based on sentencing in other cases cannot alone constitute aggravating or mitigating circumstances not adequately taken into consideration by the Sentencing Commission.") Rather, the downward departure granted Morris rests squarely on the provisions of U.S.S.G. § 5K2.0 and this Court's finding of a specific factor not adequately considered by the Sentencing Commission, namely disparity resulting from differences in relevant conduct charged against comparable coconspirators caught or prosecuted at different times during the unfolding investigation of a conspiracy.

For this reason, this case is also distinguishable from those that have upheld the general principle that equalization of sentences between codefendants, without more, does not warrant departure. *See, e.g., United States v. Wogan,* 938 F.2d 1446, 1447–48 (1st Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 441, 116 L.Ed.2d 460 (1991) (rejecting as a ground for departure "the district court's stated desire, in the interests of fairness, to equalize the sentences of two similarly situated codefendants."); *United States v. Joyner,* 924 F.2d 454, 455–61 (2nd Cir.1991) (holding that "disparity among codefendants as such is not a permissible basis for departure," and noting that "neither Congress nor the Commission could have expected that the mere fact of a difference between the applicable guideline range for a defendant and that of his co-defendant would permit a departure, either because the difference was too large or too small."); *United States v. Enriquez-Munoz,* 906 F.2d 1356 (9th Cir.1990) (rejecting an upward departure for purposes of equalization of codefendants' sentences).

In the final analysis, a judge must have discretion where, as here, she or he confronts an unusual case. To shackle a judge confronted by an unusual case to inflexible sentencing alternatives is, essentially, like restricting an artist to painting by numbers. The former is as unlikely to produce justice as the latter is to produce art. In this unusual case, the Court must depart in order to achieve reasoned uniformity and proportionality of sentences meted out to the members of the same conspiracy. Accordingly, the Court departs five levels, resulting in an offense total for Morris of 33.

Alternatively, the Court concludes that Morris' age and health, his community service, and the disproportionality of his offense level—in combination—constitute a factor not adequately considered by the Sentencing Commission and justify a downward departure in this unusual case. *See United States v. Takai,* 930 F.2d 1427 (9th Cir.1991) (in an unusual case, a combination of factors can constitute a mitigating circumstance under 18 U.S.C. § 3553(b)). Again, on this basis, the Court would depart five levels to an offense level total of 33.

H. *Sentence Imposed*

The Court commits Morris to the custody of the Bureau of Prisons for a period of one-hundred and fifty-six (156) months on Count 1, a period of sixty (60) months on Count 2, a period of sixty (60) months on Count 3, and a period of sixty (60) months on Count 4. These sentences are to run concurrently. Morris is to receive credit for time already served in connection with these convictions.

Upon release from confinement, Morris is to complete a term of five (5) years of supervised release on Count 1, a term of five (5) years of supervised release on Count 2, a term of five (5) years of supervised release on Count 3, and a term of five (5) years of supervised release on Count 4. These terms of supervised release are to run concurrently. As a special condition of the terms of supervised release, Morris is to participate in and successfully complete a program of drug treatment and rehabilitation at the direction and discretion of the Probation Office.

The Court imposes a fine for Count 1 of $25,000. The Court declines to impose any other fines in connection with this sentencing or to impose additional fines to cover the cost of incarceration or supervised release.

The Court imposes a special assessment of $200.00, pursuant to 18 U.S.C. § 3013(a)(2)(B).

I. *Statement of Reasons for the Court's Sentence*

The sentence imposed adequately satisfies the Guidelines' goals of retribution, incapacitation, and deterrence. In particular, the sentence sends an unmistakable message to lawyers that the price for crossing the line between the practice of law and the practice of crime will be dear. Those lawyers unclear about where the line lies would be well-advised to consult the canons of legal ethics, which explicitly prohibit lawyers from aiding clients in the furtherance of activities known to be criminal or fraudulent. *See, e.g.,* Rule 1.2(d), Model Rules of Professional Conduct. Moreover, all lawyers should ponder the fate of Morris. Those entrusted with the operation, maintenance, and preservation of our legal system have a preeminent obligation to uphold the law. Lawyers must vigilantly guard against breaching that duty. Those who stray into illegality must be prepared to suffer severe consequences.

Given Morris' age and poor health, the sentence the Court imposes may, in effect, amount to a life sentence. Even so, the result is not unduly harsh. This Court imposes lengthy sentences on many young people, with the result that these young people forfeit their youth behind bars. That, too, is essentially a kind of life sentence. That Morris receives his sentence of thirteen years at the end of what was apparently an otherwise exemplary life makes him no less deserving of the severe, but just, penalties prescribed by law.

Copies of this Memorandum Opinion shall be issued to all counsel of record, the United States Probation Office, the United States Bureau of Prisons, and the United States Sentencing Commission.