**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Thomas John MORRIS, Sr., Defendant-Appellant.**

**No. 91-5440.**

United States Court of Appeals, Fourth Circuit.

Argued May 7, 1992.

Decided March 10, 1993.

**1336**

Jonathan Shapiro, Jonathan Shapiro & Associates, P.C., Alexandria, VA, argued, for defendant-appellant.

Margaret Grove, Criminal Div., U.S. Dept. of Justice, Washington, DC, argued (Robert S. Mueller, III, Asst. Atty. Gen., Mary Lee Warren, Chief, William H. Kenety and Marietta I. Geckos, Trial Attys., Nathan A. Neal, on brief), for plaintiff-appellee.

Before WIDENER and PHILLIPS, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

## OPINION

WIDENER, Circuit Judge:

This case arises out of the trial of Thomas J. Morris, an attorney, on criminal charges of conspiracy to distribute drugs, aiding and abetting the attempt to possess with intent to distribute marijuana, aiding and abetting the distribution of cocaine, and aiding and abetting the establishment of a place to manufacture, distribute, and use drugs (a crack house).[1] The chief witness against Morris at trial was his former client, Samuel Balbuena, a convicted drug trafficker and dealer. Morris appeals to this court seeking a reversal of his convictions and a remand to the district court for a new trial. One assignment of error is the denial of his motion to disqualify the trial judge pursuant to 28 U.S.C. § 455(a). We

are of opinion that the district judge properly declined to disqualify himself but that there was error in the introduction of evidence with respect to the marital privilege which requires a new trial.

### I.

Morris's involvement with Balbuena began when he represented Balbuena's mother in a personal injury case. Thereafter, Morris agreed to represent Balbuena in several corporate and real estate matters. At trial it was alleged that Morris helped Balbuena's drug operations by knowingly incorporating sham corporations through which Balbuena laundered money. In addition, Morris allegedly advised Balbuena on methods of carrying out his operations and purchasing certain assets, including a boat that was used to smuggle drugs into the United States, in a manner that would avoid the reporting requirements of banks. Morris also represented Balbuena in the purchase of a house that was used to manufacture and distribute crack cocaine. It was alleged that Morris represented Balbuena in the matter with full knowledge of the intended use of the house.

Before trial, Morris's counsel made a motion to recuse the trial judge pursuant to 28 U.S.C. § 455(a) because of his previous involvement in the criminal trial of Samuel Balbuena and his sentencing reduction. After hearing argument, the district court judge denied Morris's motion. Morris appeals this ruling. Morris's main contention on appeal, however, is the introduction of evidence of his wife's claim of marital privilege before the grand jury. Other claimed errors relevant to the conduct of the prosecuting attorney were those that occurred at trial which were, in the main, not objected to and would have to constitute plain error to entitle Morris to a new trial.

Almost two months after the verdict, Morris filed a motion for acquittal or for a new trial with the district court, alleging that new evidence had been discovered that entitled him to a new trial. The district

---

**1.** Morris was charged in a four-count indictment with violations of 21 U.S.C. §§ 841(a)(1), 846, 856 and 18 U.S.C. § 2.

court denied-that motion without a hearing. Morris also appeals that ruling and asks us to remand for an evidentiary hearing on the motion.

## II.

■ Morris's first contention is that the district judge was in error when he denied Morris's motion to disqualify himself. Morris argues that the district judge's involvement with Morris's trial is improper because the same judge presided over Balbuena's criminal trial and his subsequent sentencing reduction hearing for his cooperation in Morris's prosecution. Morris contends that the judge's involvement with both trials could lead an outside observer to believe that the district court judge was rewarding Balbuena for ostensibly truthful testimony in Morris's case.

Section 455(a) of title 28 of the United States Code provides:

> Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

The intent of section 455(a) is to reduce perceived appearances problems; that is, situations in which the judge is not in fact biased, but an outside observer might nonetheless have some reasonable basis for questioning the judge's impartiality. See *Rice v. McKenzie*, 581 F.2d 1114, 1116 (4th Cir.1978). However, prior decisions make clear that the source of the appearance of partiality must arise from some source other than the judge's previous involvement with cases that concerned the parties or witnesses in the present case. *United States v. Parker*, 742 F.2d 127 (4th Cir.), *cert. denied*, 469 U.S. 1076, 105 S.Ct. 575, 83 L.Ed.2d 514 (1984); see, e.g., *In re Beard*, 811 F.2d 818, 827 (4th Cir.1987). Absent extraordinary facts, which were present in *Rice* but are not present here,[2] a nonjudicial source must be present to raise the appearance of impropriety, *Beard*, 811

F.2d at 827, and the fact that the judge had previously presided over the criminal trial of a witness in this case and was involved in adjusting that witness's sentence did not create such a problem. All of the district judge's prior dealings with Balbuena had been in the judicial context of presiding over court proceedings, and there simply was no basis for the district court judge to have recused himself.[3] We therefore affirm the district court's decision on Morris's motion that the judge recuse himself.

## III.

### A.

■ We next turn to Morris's main contention on appeal: permitting the Government to prove by Morris's wife that she had asserted the marital privilege as she declined to testify before the grand jury in this case. We are of opinion that this was reversible error.

On the morning of the fifth day of Morris's trial, the prosecutor conducting the Government's case requested that the district court rule on whether he could ask Mrs. Morris before the jury if she had invoked the marital privilege before the grand jury. The district court ruled that the question was proper on cross-examination to show bias. While Mrs. Morris was on the witness stand, defense counsel asked her whether she had appeared to testify before the grand jury and whether, as a result of talking with counsel, she had testified. She stated that she did not testify. The prosecutor then began his cross-examination of Mrs. Morris. His first question was directed to her invocation of the marital privilege:

> Q. Mrs. Morris, you're aware of something called the spousal privilege?
> A. Yes.
> Q. Would you tell the jury what the spousal privilege is.
> A. Where one spouse does not have to testify against the other spouse.

2. In *Rice*, the trial judge in a federal habeas proceeding had been the chief justice of the state court which had, in a case involving a probation violation, passed on the same claim made in the federal case.

3. We note, however, that the district judge specifically found that Morris's motion was not frivolous.

Q. But you've chosen to waive that today, haven't you?

A. I don't know.

Q. You're not invoking the privilege, are you, Mrs. Morris?

A. No.

Q. So you are waiving it and testifying, aren't you?

A. I guess I am.

Q. Now, didn't there come a time when you in fact invoked that privilege?

A. Yes.

Q. And you were invited to testify in front of a grand jury in this courthouse, weren't you?

A. Right.

Q. And you were invited to answer questions put to you by myself and members of the grand jury.

A. Yes.

Q. And you refused to answer questions, didn't you?

A. Yes.

Q. How long did you work in your husband's office?

A. Twenty-six years.

Q. Would it be fair to say you knew his practice pretty well?

A. I would say so, yes.

Q. Is it fair to say that your husband took you into his confidence? Didn't he?

A. I certainly knew the contents of the file and what had to be done.

Q. Isn't it fair to say your husband took you into his confidence?

A. Yes.

Q. Both being his wife and also his secretary.

A. Right.

Q. So you pretty much knew what Mr. Morris was doing, didn't you?

A. Yes.

This case squarely presents for the first time the question of whether it is reversible error for a prosecutor to ask the accused's wife, who is testifying as a defense witness in a criminal case, about her prior invocation of the marital privilege [4] before the grand jury. We answer that question in the affirmative.

The marital privilege is conferred upon witnesses by the Congress and not by the Constitution. See Fed.R.Evid. 501; see also *Port v. Heard,* 764 F.2d 423, 430 (5th Cir.1985) ("[T]he marital privilege has never been placed on a constitutional footing."). The privilege has been a feature of the common law for centuries. See 8 John H. Wigmore, *Wigmore on Evidence* § 2227 (John T. McNaughton ed. 1961); II *Kent's Commentaries* 178 (3d ed. 1836). Congress provided in the Federal Rules of Evidence that the rules concerning privilege that "the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. Thus, Congress intended to preserve for today's witnesses the privileges that had existed at common law.

The United States Supreme Court has recognized the policy concerns that underlie the marital privilege. In determining whether to reconsider the scope of the marital privilege, the Court noted: "[T]he long history of the privilege suggests that it ought not to be casually set aside. That the privilege is one affecting marriage, home, and family relationships—already subject to much erosion in our day—also counsels caution." *Trammel v. United States,* 445 U.S. 40, 48, 100 S.Ct. 906, 911, 63 L.Ed.2d 186 (1980).[5] Thus, the Supreme

---

**4.** In this case we deal solely with the privilege against adverse spousal testimony. A separate privilege for spousal communications also exists. Both of these privileges are commonly referred to as the marital privilege. We do not have before us the question of spousal communication.

**5.** In *Trammel,* the Court determined that limiting to the witness-wife the right to invoke the privilege in order not to be compelled to give

adverse testimony against her husband furthered "the important public interest in marital harmony." *Trammel,* 445 U.S. at 53, 100 S.Ct. at 914. The Court overruled its prior decision in *Hawkins v. United States,* 358 U.S. 74 (1958), which recognized in either spouse the right to invoke the privilege. The Court concluded that when one spouse chose to testify against the other, there was "probably little in the way of marital harmony for the privilege to preserve." *Trammel,* 445 U.S. at 52, 100 S.Ct. at 913.

Court has determined, "in light of reason and experience," that the marital privilege is still important.

Given that the marital privilege is one that remains vital in modern jurisprudence and has been sanctioned by Congress and the Supreme Court, it is apparent that we should guard against turning the privilege into an empty promise. This is not to say that the scope of the privilege is never subject to change, rather that any change should be made with caution, see *Trammel*, 445 U.S. at 48, 100 S.Ct. at 911, and that trial practices which undermine the privilege should be reviewed with a careful eye. We are of opinion that the practice of cross-examining before a petit jury a defense witness-wife about her invocation of the marital privilege before the grand jury is a practice that deserves close scrutiny.

We begin our inquiry by referring to the long line of cases which hold that it is error for a prosecuting attorney to ask a defense witness at trial about that witness's invocation of the Fifth Amendment privilege against self-incrimination before the grand jury. See *Nezowy v. United States*, 723 F.2d 1120 (3d Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984); *United States v. Rubin*, 559 F.2d 975 (5th Cir.1977), *vacated on other grounds*, 439 U.S. 810, 99 S.Ct. 67, 58 L.Ed.2d 102 (1978); *United States v. Williams*, 464 F.2d 927 (8th Cir.1972); *United States v. Tomaiolo*, 249 F.2d 683 (2d Cir.1957); see also *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963) (finding that when there was no prosecutorial misconduct and the defendant was not unfairly prejudiced, it was not reversible error for the prosecuting attorney to ask questions that prompted the witness to invoke the privilege, despite the prosecuting attorney's knowledge that the witness would invoke the privilege); *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (reversing under supervisory powers defendant's conviction when prosecutor asked defendant about his prior invocation of the Fifth Amendment privilege before the grand jury; the four concurring justices would have simply made the question un-

lawful); *United States v. Barber*, 668 F.2d 778, 785 (4th Cir.) ("It needs no extensive discussion to establish that, without a good reason, one should not be asked about the invocation of the Fifth Amendment Privilege."), *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982); cf. *Meadows v. Legursky*, 904 F.2d 903 (4th Cir.) (en banc) (holding absent the probability of the conviction of one who was actually innocent, on habeas corpus review court will not reverse for cross-examination about invocation of privilege when the error was not objected to at trial), *cert. denied*, 498 U.S. 986, 111 S.Ct. 523, 112 L.Ed.2d 534 (1990). These cases recognize that the error does not arise from the witness's Fifth Amendment rights, rather

> [b]ecause of the ever present danger that a jury might misunderstand the context in which such fifth amendment questioning occurs, and because such inquiries, invariably challenged at trial and questioned on appeal no matter how well-intentioned, may infect an entire trial which is otherwise free from error, and because we too find it difficult to imagine any circumstance where such examination would be relevant and appropriate, we hold that questioning of a witness by the Government as to whether he had previously claimed the constitutional right to refuse to testify at a grand jury proceeding will constitute trial error, subject only to harmless error determination.

*Nezowy*, 723 F.2d at 1124 (footnote omitted); accord *Grunewald*, 353 U.S. at 421–24, 77 S.Ct. at 982–84; *Williams*, 464 F.2d at 930–31.

We are of opinion that these same concerns are present when the accused's wife is asked about her invocation of the marital privilege before the grand jury. The wife's silence may cause the jury to believe that she was silent to protect her husband and is lying at trial to protect him further. Indeed, the avowed purpose of introducing the assertion of the privilege was to question Mrs. Morris's credibility, and it is self-evident that marital silence offers the same protection as does Fifth Amendment si-

lence. In the Fifth Amendment context on similar facts, the Supreme Court of Illinois noted:

> [W]e cannot overlook in this case the likelihood that the jury not only inferred guilt on the part of defendant's wife from her refusal to testify before the grand jury, but that the inference was also transferred to the defendant. The likelihood is most acute in precisely this type of case; that is, one in which the relationship between the defense witness and the defendant is extremely close.... Here, it would have been quite natural for the jury to draw the inference from a wife's refusal to testify before the grand jury that she was sheltering not so much her own guilt, but that of her husband.... The inference would directly stigmatize the defendant and prevent him from securing a fair and impartial trial on any of the charges.

*People v. Godsey,* 74 Ill.2d 64, 23 Ill.Dec. 117, 122–23, 383 N.E.2d 988, 993–94 (1978). The same policy concerns present in *Godsey* are present here. The inference that a wife remained silent before the grand jury because she knew information that would inculpate her husband is one the jury is likely to draw. The Government must not be allowed to try its case by the use of improper inferences. See *Namet,* 373 U.S. at 186, 83 S.Ct. at 1154–55 (noting that it is reversible error for the prosecution to cross-examine a witness about the prior invocation of the Fifth Amendment privilege when the purpose is to "build [the Government's] case out of inferences arising from the use of testimonial privilege"). Further, the inference that the wife knew information and chose to remain silent before the grand jury casts a taint on her subsequent exculpatory testimony at trial. Cf. *Williams,* 464 F.2d at 930 (finding reversible error in part because of prosecutor's argument that the witness, who had declined to testify before the grand jury on

Fifth Amendment grounds, would have testified before the grand jury, as he did at trial, if his exculpatory trial testimony had been true, because the witness was a close friend of the defendant's).

The concern that a jury may infer a husband's guilt from the wife's claim of privilege also underlies the rule that a prosecutor may not call the accused's wife to the witness stand for the purposes of making her invoke the privilege in front of the jury. See *United States v. Chapman,* 866 F.2d 1326 (11th Cir.),[6] *cert. denied,* 493 U.S. 932, 110 S.Ct. 321, 107 L.Ed.2d 312 (1989). The American Bar Association Standards Relating to the Administration of Criminal Justice Standard 3–5.7(c) are directly on point: "A prosecutor should not call a witness who the prosecutor knows will claim a valid privilege not to testify for the purpose of impressing upon the jury the fact of the claim of privilege." This concern also was the foundation for cases which held that the prosecution could not call the accused's spouse to the witness stand for the purpose of making the accused assert the marital privilege in front of the jury when the prosecution knew the privilege would be asserted.[7] The core reasoning of these cases is that, since the marital privilege is recognized, the privilege should not be undermined by permitting the prosecution to gain an advantage with the jury by inferring that if the spouse's testimony were in fact exculpatory, the defendant would not be asserting the privilege. *Tallo v. United States,* 344 F.2d 467, 469–70 (1st Cir.1965); *San Fratello v. United States,* 343 F.2d 711, 712 (5th Cir.1965) (motion for rehearing); see also *Courtney v. United States,* 390 F.2d 521, 528 (9th Cir.), *cert. denied,* 393 U.S. 857, 89 S.Ct. 98, 21 L.Ed.2d 126 (1968) (reversing conviction because the district court erred in requiring the marital privilege to be asserted before the jury, if at all, and allowing prosecutorial comment on de-

---

6. In *Chapman* the Eleventh Circuit held that the prosecutor's improper calling of the defendant's wife and his improper statements regarding the marital privilege in closing argument were error, but not plain error. Chapman failed to object to both of these acts at trial.

7. Prior to *Trammel,* the marital privilege rested with either spouse, who might assert the privilege. See *Hawkins v. United States,* 358 U.S. 74, 78, 79 S.Ct. 136, 138, 3 L.Ed.2d 125 (1958), *modified by Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980).

fendant's wife's failure to testify, which effectively destroyed the spousal privilege).[8] This reasoning applies equally to the situation before us. The prosecutor's cross-examination of Mrs. Morris about her invocation of the privilege is bound to have had as a purpose to infer that she would have testified before the grand jury if she had something exculpatory to say. To permit such an inference would destroy the privilege. Indeed, if we were to allow this practice to continue, a defendant whose spouse invoked the privilege would be in greater peril, because of the improper inference, than a defendant whose spouse testified at both proceedings. Thus, the assertion of the privilege would mean a necessary disadvantage, an unacceptable result.

We therefore hold that it is reversible error, subject to a harmless error analysis, for a prosecutor to cross-examine the wife of an accused about her invocation of the marital privilege before the grand jury. Our decision today fosters Congress's intent as expressed in Fed.R.Evid. 501, protects the marital privilege, and furthers the policy concerns inherent in the Supreme Court's opinions and our own. Accord: *United States v. Hall*, 989 F.2d 711 (4th Cir.1993).

### B.

■ Our final consideration with respect to this assignment of error is to decide whether the error committed was harmless. We are of opinion that it was not.

This case turned on credibility. The Government's principal witness was one Balbuena, a convicted narcotics dealer and racketeer, who had waived appeal to at least part of his convictions and had gone to work for the Government. Without his testimony, conviction on any of the counts would have been problematic, at best. Morris had been his attorney for some time. Many, or even most of the acts with

which Morris was charged were acts committed in the practice of law in Morris's representation of Balbuena and could either have been entirely innocent, as Morris contended they were, or as part of Balbuena's criminal operations relating to the sale and distribution of narcotics, including marijuana and cocaine. For example, Morris advised Balbuena with respect to a change of name; he established corporations for Balbuena; he prepared notes for Balbuena in connection with the lending of money; he prepared deeds to real estate for Balbuena; he purchased a home for his son from Balbuena; he advised Balbuena with respect to obtaining bail in a criminal case for one of Balbuena's employees. And the charges from the indictment of similar incidents go on and on. Of the events just related, Balbuena claimed they were accomplished with evil intent, while Morris claimed they were innocently done. For example, Balbuena claimed that a note Morris had prepared for him, and claimed was innocently prepared, was (to Morris's knowledge) for a loan to invest in drug smuggling; and the deed for the transfer of a house, prepared under like claim of innocence, was (to Morris's knowledge) so that the house could become a crack house. Balbuena claimed that Morris knew the criminal purpose of both these transactions. Morris, therefore, had to prove a negative, always difficult. While he acknowledged committing many of the acts with which he was charged, he had to show that they were innocently done rather than with evil intent. While it is true that there was corroboration of many of the acts which Balbuena charged from other Government witnesses, most of these witnesses were testifying under plea agreements or in hopes of receiving sentence reductions, or both.

At the conclusion of the Government's case, it was at once apparent to all that the case depended upon credibility. Many of

---

**8.** While the facts in *Courtney* may be distinguishable from the case at hand in that the defendant's wife in *Courtney* did not testify and that *Courtney* was pre-*Trammel*, the principle is precisely the same as in our case, needing only slight analogy for persuasive effect. Similar

holdings are found in *Graves v. United States*, 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893); *United States v. Smith*, 591 F.2d 1105 (5th Cir. 1979); and *United States v. Pariente*, 558 F.2d 1186 (5th Cir.1977). See also *United States v. Tapia–Lopez*, 521 F.2d 582, 584 (9th Cir.1975).

the acts which the Government had proved, and which it maintains were done with evil intent, were witnessed only by Morris, or Balbuena, or one of Balbuena's confederates, or Morris's wife, who was his secretary and intimately familiar with the affairs in his office.

The district court recognized that the case depended on credibility, for it stated, in denying the Rule 29 motion for acquittal on two counts of the indictment (3 and 4), as follows:

> This is a case involving credibility. If the jury chooses not to believe these witnesses, then of course, as they are entitled to do and there has been a great deal of testimony that reflects on their credibility, the jury may choose not to believe them; and the jury may choose not to convict. But the evidence is there, whether it is believed or not. If it's not believed, then the jury will not convict. If they do, they may.

So the principal person who could help Morris was his wife, who was also his secretary.

It was perfectly apparent, and the prosecutor is bound to have known it, that Mrs. Morris was Morris's best hope for acquittal. She was the only person, other than the Government witnesses and Morris, who had been present on many of the occasions in question. She was also Morris's secretary and was intimately acquainted with his affairs. The prosecutor began by asking her to define the spousal privilege, to which she responded that it prevented one spouse from being forced to testify against the other. He then confirmed that she had invoked the privilege when the Government had called her to testify before the grand jury, and then immediately turned to the length of time she had worked in Morris's law office. He emphasized that Morris confided in her about his practice because she was both his wife and his secretary. This questioning was open and obvious proof to the jury of facts which the Government claimed tended to show that, knowing her husband's affairs intimately, Mrs. Morris had claimed the marital privilege to prevent her testimony of evidence of guilt

before the grand jury, so now, at trial, her exculpatory evidence was a lie. Indeed, the prosecutor took the position that the assertion of the privilege "shows bias that she refused to speak in, shall we say, a different forum; that she declined to answer the Government's questions." And again, "it is inconsistent for her to say 'I invoke the privilege on one occasion' and today say 'no, I don't invoke the privilege. I'm going to go ahead and testify'." The district court decided that proof that Mrs. Morris had asserted the marital privilege before the grand jury was relevant "on the issue of bias" and that "its relevance on the issue of bias outweighs the unfair prejudice."

Thus, the Government took the position, and the district court decided, that proof of the assertion of the marital privilege was not only relevant proof of bias but that the relevance of the proof of bias was so great as to overcome the unfair prejudice from its use. We think that the positions of the Government and the district court were both in error. If proof of the assertion of the marital privilege is proof of bias, it means that there is no privilege. And if proof of the assertion of the marital privilege is relevant evidence of bias, it is likewise a practical destruction of the privilege, if measured under Rule 403, as the district court did, for the exercise of the privilege would be subject to a finding as to whether the relevancy of the assertion outweighs its prejudicial effect. Taken singly or together, the positions of the Government and the district court would mean the destruction of the privilege. To repeat, we are of opinion that the introduction into evidence of Mrs. Morris's assertion of the marital privilege was inadmissible as in derogation of the privilege. We are also of opinion that it was not relevant evidence and should have been excluded for that additional reason.

We are further of opinion that the error was not harmless. In *United States v. Williams, supra,* the court held that introducing the fact of a witness's refusal to testify before the grand jury because of the invocation of the witness's Fifth Amendment privilege was reversible error

where the testimony of that witness was crucial to the defense. The court stated, "the prosecutor's efforts to weaken the force of this testimony through improper impeachment cannot be deemed harmless." 464 F.2d at 931. That same principle should apply here. Mrs. Morris's testimony was, in all respects, crucial to the defense. Not only did she have intimate knowledge of the affairs of Morris, she was, as to many incidents, the only corroborative witness that he had. We see no difference between the improper impeachment of the witness in *Williams* and the improper impeachment of Mrs. Morris in this case. Similarly, in *Godsey,* the testimony of the defendant's wife as to a part of the defense "was the linchpin in the defense." The court did not dispute that there may have been sufficient evidence to convict the defendant but stated that "[t]he impeachment of defendant's wife not only undermined the defense of those charges to which she directly testified, but it tended to enhance the credibility of the ex-girlfriend, whose testimony permeated the entire case." 383 N.E.2d at 993. Here the impeachment of Mrs. Morris not only undermined her testimony as to the incidents to which she testified, but also, because so weakened, tended to enhance the testimony of Balbuena, whose testimony permeated the entire case. We find *Williams* and *Godsey* persuasive.

Finally, in considering whether or not the error was harmless, we measure the effect of the error under *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[9] The rule is:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But, if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether

there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 764–65, 66 S.Ct. at 1247–48.

Considering that Mrs. Morris was a critical witness, had intimate knowledge of the defendant's affairs, was the most important corroborative witness that he had, and that the case depended wholly, or almost so, on credibility, we are of opinion that the error had substantial influence on the outcome of the case. Even if this were not so, we are yet left in grave doubt as to whether or not the error had substantial influence on the outcome of the case. Thus, the conviction cannot stand.

### IV.

Morris has made other assignments of error which we will mention briefly.

Morris argues that the conduct of the prosecutor constituted plain error as the prosecutor suggested to an expert witness that he had tailored his testimony; had asked character witnesses whether Morris represented narcotics traffickers and whether Morris drove a great big Cadillac; had asked a witness whether Morris represented dirty cops; had accused an attorney who was testifying of violating the attorney-client privilege; and had solicited from Balbuena adjectives which indicated Morris was a homosexual, and then argued the same with slight denial. While that list of Morris's complaints is not complete, it illustrates the entire tone of the trial as exemplified by the following exchange:

> Q: Good afternoon, Mr. Morris.
>
> A: Good afternoon, Mr. Kennety [the prosecutor].
>
> Q: Would it be fair to say that what we've seen today is a carefully rehearsed performance by yourself?
>
> A: That would be unfair, Mr. [Kennety].

---

**9.** *Kotteakos* was a case involving the sufficiency of evidence to sustain the conviction when the evidence showed several conspiracies instead of the single conspiracy charged.

While most of the presently claimed prosecutorial excesses were either not objected to or not followed by motions for a mistrial, the claim now is that they constituted plain error. See *United States v. DePew*, 932 F.2d 324, 327–328 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 210, 116 L.Ed.2d 169 (1991). We should say that it is with some relief that we do not have to decide whether or not the conduct of the prosecutors in this case was plain error, for there is arguable merit in some or all of the accusations mentioned above. Because a new trial has been awarded on other grounds, we do not decide the same and mention the matter so that the district court will ensure that the conduct of the next prosecution of this case is on a considerably higher plane than that which appertained in the trial which is here on review.

Morris has also complained about the failure of the district court to award him a new trial on the basis of after-discovered evidence under Fed.R.Crim.P. 33. We do not decide that question, because upon a new trial, whatever evidence is sought to be introduced at the new trial, which was the subject of the after-discovered evidence motion at the first trial, will not then be after-discovered evidence.

While there are other assignments of error, none of them would result in anything more than a new trial, and we do not decide the same because they probably will not recur in a new trial. Should they recur, there is plenty of time to decide them upon any future appeal.

The convictions are accordingly vacated and the case is remanded for a new trial.

VACATED AND REMANDED.