UNITED STATES of America

v.

Thomas MORRIS, Sr.

Crim. No. 91–00124–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 19, 1993.

Helen Fahey, U.S. Atty., Christopher Supple, Spec. Asst. U.S. Atty., Alexandria, VA, for plaintiff.

John A. Keats, Fairfax, VA, for defendant.

*SENTENCING MEMORANDUM*

ELLIS, District Judge.

This memorandum opinion recounts the final chapter in the government's prosecution of Thomas Morris, Sr.

Morris, a sixty-five year old member of the Virginia bar, was an experienced, well-known and well-regarded Northern Virginia lawyer when he was named in a four-count indictment charging him with various drug trafficking crimes, including conspiracy to possess cocaine with the intent to distribute it.

Morris had been the lawyer for Samuel Balbuena, a drug kingpin who patterned his life after that of the title figure in the film "Scarface," and who organized and led a massive drug conspiracy responsible for distributing millions of dollars of cocaine, "crack" and marijuana throughout the Washington area for more than six years. The indictment, in essence, charged Morris with stepping over the line as a lawyer and acting instead as a knowing and willful participant in the Balbuena conspiracy and as an aider and abettor of various drug trafficking crimes. A five day trial ended with jury verdicts of guilty on all four counts. *See United States v. Morris,* 781 F.Supp. 428 (E.D.Va.1991). Balbuena and various other

members of the conspiracy who had earlier pled guilty, testified pursuant to plea agreement obligations and the jury apparently found credible and persuasive their testimony implicating Morris in the conspiracy's illegal activities. After denying post-verdict motions, the Court sentenced Morris to a total term of imprisonment of 156 months, to be followed by five years of supervised release. *Id.* at 430. The Court also imposed a $25,000 fine and a $200 special assessment. *Id.* Because the conspiracy's activities spanned the period 1983–1989, Morris' sentence was controlled by the Guidelines. And under the Guidelines, Morris' original sentencing range was 235 to 293 months. At sentencing, however, the Court granted Morris' motion for a downward departure on alternate grounds and departed downward five levels. Thus the sentence imposed was severe, but not as severe as it might have been absent the downward departure.

█ Morris appealed his conviction and sentence on a variety of grounds. In reversing and remanding for a new trial, the Fourth Circuit panel rejected one ground[1] and found it unnecessary to reach others because it found plain error in the prosecutor's eliciting from Mrs. Morris that she had invoked the marital privilege before the Grand Jury. *See United States v. Morris,* 988 F.2d 1335 (1993).[2]

On remand, the government elected to retry Morris and the Court accordingly set a trial date consistent with the requirements of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* As the trial date drew near, the government, represented now by a new team of Department of Justice attorneys, sought a short continuance on the ground that additional time was needed to interview witnesses, many of whom were inmates at federal correctional facilities around the country. The Court denied the continuance and the trial commenced on schedule.

As is true more often than not, the second trial was not a carbon copy of the first. While the thrust of the government's case was the same—namely that Morris had joined and actively participated in Balbuena's drug trafficking conspiracy—other aspects of the second trial differed markedly from the first. One difference was the government's use in its case in chief of a portion of Morris' testimony from the first trial. The most significant difference was that Balbuena, although in custody in the courthouse lockup was not called to testify by either party.[3] At the conclusion of the government's case, Morris, by counsel, moved for a judgment of acquittal pursuant to Rule 29, Fed.R.Crim.P. Even without Balbuena's testimony, the thrust of the government's evidence remained the same, namely, that Morris was a knowing and willing participant in various aspects of the Balbuena drug trafficking conspiracy. Specifically, the Court found that there was ample evidence from which a reasonable jury could find, beyond a reasonable doubt each and every element of each of the indicted offenses. Accordingly, Morris' Rule 29 motion was denied. Thereafter, following Morris' case, there was no government re-

---

1. Morris' appeal included the contention that this Court erred in denying his motion for recusal pursuant to 28 U.S.C. § 455. The Fourth Circuit rejected this contention and affirmed the denial of the recusal motion. *Morris,* 988 F.2d at 1337.

2. The opinion, *obiter dictum,* sharply criticized the prosecutor's conduct in the trial, including the prosecutor's style of questioning of hostile witnesses by strongly implying that the witness was fabricating answers. Interestingly, it is common practice in British courts for barristers to suggest to witnesses that they are fabricating or tailoring their testimony. Nor indeed is this an uncommon practice in this country, especially in hotly contested cases where witnesses give conflicting testimony. In such cases, lawyers often suggest, implicitly or explicitly, either in their arguments or their questions, that the testimony of a witness is fabricated or tailored. This practice is understandably distasteful to some and is of doubtful efficacy, but it violates no rule or canon. Of course, lawyers may not vouch for a witnesses' credibility, nor may lawyers attack a witness through name-calling and the like.

3. While it is difficult to know why each party chose not to call Balbuena as a witness, it is perhaps worth noting that this Court, in another context, noted that Balbuena could be counted to tell the truth unless the truth, in the circumstances, happened to coincide with his interests as he perceived them. Not surprisingly, it was reported that Balbuena told a magazine writer a story arguably exonerating Morris that sharply conflicted with his trial testimony.

buttal case and the matter was submitted to the jury on instructions essentially similar to those given in the first trial.

In the course of deliberations, the jury propounded several questions to the Court, the nature of which arguably invited the inference that the jury considered Morris guilty of conspiracy. Morris apparently elected to view these questions as the proverbial "handwriting on the wall," and sought leave to plead guilty to a non-guidelines (pre-November 1987) conspiracy charge with an agreement to limit the sentence to time already served. The Court advised Morris that it would not accept any plea involving an agreement as to sentence as permitted in Rule 11(e)(1)(C). Rather, Morris was advised that should he choose to enter a plea, he would have to take his chances that the Court would impose a more severe sentence. The Court noted, however, that a "time-served" sentence might not be inappropriate and that such a sentence would be considered, along with other possible sentences. Most importantly, the Court advised Morris that no plea would be accepted without an explicit admission of guilt from him, nor would it be accepted unless the Court was convinced that there was a sound factual basis for the plea. In this Court, Morris was told, defendants may not plead guilty to something they did not do.

In the end, Morris elected to plead guilty to a criminal information charging that he unlawfully, willfully and knowingly conspired with Balbuena and others to commit various marijuana and cocaine trafficking offenses, in violation of 21 U.S.C. §§ 846 and 841(a)(1). In the course of the plea colloquy, Morris unqualifiedly admitted his guilt. Quite apart from this admission, the Court had no difficulty concluding that there was a sound factual basis for the plea. Indeed, based on the record of the second trial, the Court was convinced beyond a reasonable doubt that Morris had knowingly and wilfully participated in a pre-Guidelines drug trafficking conspiracy with Balbuena and others.[4] Following allocution, the Court, without objection from the government, imposed a sentence of time served (almost two years) and a $50 special assessment.

Discerning observers will surely be struck by the disparity between the sentences imposed on Morris after the first and second trials. The Court, too, has reflected considerably on this disparity, both prior to and since the imposition of the second sentence. The fact is, the Court devoted substantial time and effort to setting an appropriate sentence in both instances. And the fact is, paradoxically perhaps, that the Court was satisfied at the time each sentence was imposed that it was a fair, just and appropriate sentence in the circumstances. Yet, the disparity demands explanation if sentencing is to be more principled than arbitrary. As it happens, however, even with the perspective provided by the luxury of hindsight, there is no simple, definitive, complete explanation.[5] Even so, there are several factors that help explain and justify the disparity, at least in a general qualitative way.

The more severe, initial sentence was imposed under the Sentencing Guidelines, but only after the Court granted a substantial departure that reduced the sentencing range from approximately 20 to 28 years down to approximately 11 to 14 years.[6]

---

4. The Criminal Information to which Morris pled guilty provides the following non-inclusive list of overt acts committed by Morris in furtherance of the charged conspiracy.

    1) In or around March, 1987, Morris prepared a promissory note to secure the loan of $50,000 from Pleasant "Pete" Lewis to Samuel Balbuena, knowing that the proceeds of said loan were intended to be applied by Balbuena toward the purchase of a large quantity of marijuana.

    2) In or about May, 1987 at Balbuena's request, Morris advised the incarcerated LaRue Harris not to speak with law enforcement authorities, and participated in a plan to have Pleasant "Pete" Lewis sell cocaine on behalf of Balbuena to raise bail money for LaRue Harris' release from incarceration.

The record of the second trial included ample, credible, and compelling evidence that both overt acts occurred, as alleged in the Information.

5. It is tempting in these circumstances to say, as Shaw is reputed to have said of the riddle of Wagner's Ring, the answer is in the experience.

6. Notwithstanding this substantial departure, the first sentence was unquestionably severe, arguably amounting to a life sentence given Morris' age and infirmities. As noted at the time, howev-

This sentence reflects the severe drug offense penalties built into the Guidelines by Congress and the Sentencing Commission. It also reflects a trial record that convincingly implicated Morris in a conspiracy of substantial dimension that spanned a lengthy time period. This is significant because under the Guidelines, a drug trafficking defendant is chargeable, for sentencing purposes, with the total amount of drugs possessed or distributed by co-conspirators in connection with the conspiracy, provided this amount was known to defendant or reasonably foreseeable by him. *See United States v. Gilliam*, 987 F.2d 1009 (4th Cir.1993); *see also United States v. Irvin*, 2 F.3d 72 (4th Cir. 1993). Thus, for purposes of the first sentence, Morris was chargeable with participation in a conspiracy spanning approximately six (6) years and involving distribution of five (5) to fifteen (15) kilograms of cocaine.

The second, less severe sentence, neither governed nor driven by the Guidelines, reflects that Morris' plea and admission of guilt was to participation in a conspiracy somewhat shorter in length and involving smaller (but still quite substantial) quantities of cocaine. It must also be said that the second sentence gave more weight than the first to Morris' age and poor health than did the first. *Cf. Morris*, 781 F.Supp. at 442. Further, in light of Morris' plea, the issue of proportionality was less significant in setting the second sentence. *Cf. Id.* at 442–43. All in all, the second sentence, while remarkably lenient, seemed appropriate in the circumstances, especially given Morris' age, his illnesses and the fact that he stood disgraced at the bar of justice, certain to be disbarred.

Sentencing is not an exact science. Guidelines, while effective to eliminate arbitrary disparities, nonetheless import into the sentencing process an illusory mathematical precision that, when slavishly followed, is antithetical to effective and conscientious sentencing. Ultimately, the sentencing decision is as intensely human and emotional as it is analytical; it is a quest for a sentence that best effectuates the criminal justice system's goals of deterrence (general and specific), incapacitation, retribution and rehabilitation. Specific deterrence, incapacitation and rehabilitation were essentially irrelevant in Morris' case; there is no significant likelihood that he will engage in future criminal conduct, whatever the sentence. Nor does retribution call convincingly for a lengthier sentence. To be sure, those involved in narcotics conspiracies are purveyors of poisons that cause incalculable human harm and threaten to rend the fabric of our society. Parents and loved ones of addicted customers of the conspiracy understandably want retribution. In this instance, however, two years in prison, coupled with disgrace and disbarment after a life spent in the law seemed enough retribution, especially given the substantial community support Morris enjoyed[7] and the evidence that he had, in earlier times, achieved some success at the bar. His criminal conviction and presumably, his disbarment, does not erase the good he achieved in his life, but it certainly tarnishes and degrades it and the stigma of this is, indirectly, part of the retributive effect of the sentence. More retribution seemed excessive.

General deterrence was the dominant consideration in the Morris sentencing. What happened to Morris was important in terms of the message it conveyed to the bar and to the public about the bar. Morris crossed the forbidden boundary between the practice of law and the practice of crime. The result in his case must serve as a beacon to lawyers to be ever vigilant not to cross the line between acting as a lawyer on behalf of persons accused of criminal conduct and helping criminals commit crimes. In this regard, the Court considered that the sum total of all the

---

er, this sentence, while severe, was not unduly harsh in view of the lengthy Guidelines sentences typically imposed on young men for drug trafficking offenses, sentences which are in a sense life sentences as they amount to the forfeiture of these young men's youth and perhaps even middle age. *See Morris*, 781 F.Supp. at 445.

7. At trial, several distinguished lawyers testified as character witnesses for Morris. Many more sent supporting letters for consideration at sentencing. And, at the first sentencing hearing, the courtroom was filled with more supporting lawyers. Of course, all of these lawyers were present to support Morris as an individual, but not his criminal conduct.

events, both sentences and both trials, sent the appropriate message to the bar and thus amounted to adequate general deterrence.