COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Huff, AtLee and Ortiz


KASHIF BASHIR

                                                MEMORANDUM OPINION* BY
v.       Record No. 1603-23-4                   JUDGE DANIEL E. ORTIZ
                                                OCTOBER 15, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Carroll A. Weimer, Jr., Judge

(Taso R. Saunders, on brief), for appellant.

(Jason S. Miyares, Attorney General; Justin B. Hill, Assistant
Attorney General, on brief), for appellee.


Kashif Bashir pleaded guilty to arson, making a false statement on a form to purchase a

firearm, possessing a firearm after being acquitted of a felony by reason of insanity, and

unauthorized use of an electronic tracking device.  The court convicted Bashir and sentenced him to

life imprisonment plus 10 years and 12 months' incarceration and a $500 fine.  On appeal, Bashir

argues that the trial judge abused his discretion by failing to recuse himself and by imposing a

"grossly disproportionate" sentence.  After examining the briefs and record in this case, the panel

unanimously holds that oral argument is unnecessary because "the appeal is wholly without merit."

Code § 17.1-403(ii)(a); Rule 5A:27(a).  Finding no error, we affirm.

BACKGROUND

On appeal, we review "the evidence in the 'light most favorable' to the Commonwealth,

the prevailing party in the trial court."  *Welch v. Commonwealth*, 79 Va. App. 760, 765 n.1

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

(2024) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). That standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Before accepting Bashir's guilty pleas, the trial court conducted an extensive colloquy with him to ensure they were being freely and voluntarily entered. Bashir represented that he had discussed the charges with his attorney, understood what the Commonwealth had to prove to sustain convictions, and decided to plead guilty because he was "in fact guilty." Further, he understood that by pleading guilty he waived certain constitutional rights. Moreover, he knew that there was no "agreed" disposition for the charges, so the court could sentence him to a maximum of life imprisonment plus 10 years and 12 months' incarceration and a $500 fine. Bashir further understood that the discretionary sentencing guidelines[1] did not "bind[]" the court.[2]

The Commonwealth provided an extensive proffer of its evidence. In February 2013, Bashir shot a City of Alexandria police officer in the head during a traffic stop. He was charged with attempted capital murder, aggravated malicious wounding, and two counts of using a firearm in the commission of a felony. The Circuit Court of the City of Alexandria, however, found Bashir not guilty by reason of insanity ("NGRI") and committed him to the Department of Behavioral Health and Developmental Services for inpatient treatment. Over several years, Bashir progressed through privilege levels as part of his treatment, and the Prince William County Community Services Board worked with him to secure housing pending his conditional release. In 2018, he was

---

[1] The sentencing guidelines recommended between one year and three months' and three years' incarceration, with a midpoint of two years and ten months.

[2] The Commonwealth moved to nolle prosequi stalking and attempted arson charges because it believed the evidence was insufficient to sustain convictions on those charges.

released under a plan that prohibited his possession of or access to firearms and his use of alcohol and controlled substances. K.G., the "program manager," signed the release plan.

Although Bashir's conditional release was initially unremarkable, by the end of 2018 his treatment team "became concerned about his behavior" towards female therapists, including N.K., A.S., and J.B. He "often crossed professional boundaries" by asking the therapists personal questions; he particularly fixated on J.B., insisting that she perform his treatment sessions. Bashir revealed that he knew where J.B. lived even though she had not disclosed that information. He also stated that he was "attached" to J.B. and sent her text messages that "were possessive in nature."

In January 2019, while treatment was ongoing, Bashir purchased a Smith and Wesson pistol and ammunition from a gun show. Because the transaction was a private sale, Bashir did not complete a background check to buy the gun. Two days later, Bashir went to a firearms retail store and gun range where he purchased a silencer and an hour of range time.

At 3:52 a.m. on January 27, 2019, Bashir obtained an Uber ride to a location "within walking distance" of K.G.'s home. Less than 30 minutes later, he obtained an Uber ride back to the area of his apartment. Later that morning, K.G. awoke to the smell of gasoline, and her husband called 911. Firefighters found "an open container that appeared to contain gasoline just outside [K.G.'s] back sliding glass door."

Four days later, Bashir went to another firearms retail store where he purchased another pistol with a threaded barrel that was compatible with the silencer he had purchased a couple of weeks earlier. During the purchase, Bashir submitted to a background check and completed two forms as required by state and federal law. On the forms, Bashir stated that he had not been "committed to a mental institution," nor had he "been acquitted" of a crime "by reason of insanity and prohibited from purchasing, possessing or transporting a firearm." But "[d]ue to a clerical error," Bashir's "status as an NGRI acquittee was not logged into the Virginia State Police data

- 3 -

base," so he was able to "complete[] the transaction." After leaving the retail store, Bashir purchased an oil filter from a Walmart store, even though he did not own a vehicle.

At 3:42 a.m. on February 6, 2019, Bashir obtained an Uber ride to the home of his NGRI coordinator, E.D. He doused E.D.'s vehicle with gasoline, started a gasoline fire in a "mulch bed mere inches" from her house, and "walked away." The fire damaged a downspout and siding of the house. As one of E.D.'s neighbors noticed and then extinguished the fire, Bashir obtained an Uber ride to J.B.'s house, arriving shortly before 5:00 a.m. Bashir then doused J.B.'s vehicle with gasoline using a plastic squeeze bottle and left the bottle on the windshield wipers before obtaining a third Uber ride back to his apartment.

Shortly after these events, K.G., E.D., and J.B. shared their experiences involving gasoline with each other, and E.D. decided to report the fire outside her house to law enforcement. A subsequent investigation uncovered a neighbor's NEST security footage, which depicted a person dousing E.D's vehicle with gasoline and starting a fire in the mulch bed.

During the morning of February 7, 2019, four police officers went to Bashir's apartment to speak with him about the above events. Bashir stated that he woke at 6:00 a.m. on February 6, 2019, and spent the day receiving treatment. He claimed that he was "at home all night" and denied being near E.D. or J.B.'s houses. Bashir denied having any problems with his therapist, though he admitted telling J.B. "that he had feelings for her." Later that afternoon, officers executed a search warrant at Bashir's residence while he was at a therapy session; they found (1) an "empty box for a realtime GPS tracker made by Land, Air, Sea," (2) plastic squeeze bottles similar to the bottle found on J.B.'s vehicle, one of which contained a white, granular substance, (3) chlorinating tablets, (4) brake fluid, (5) an oil filer, (6) a fuel filter, (7) a "black, metal tube with threaded ends," (8) knit gloves, (9) a lighter, and (10) several used match books.

An expert witness would have testified that the granular white powder contained an acid commonly used for pool chlorination, which would "self-ignite when mixed with brake fluid."

Officers also found a "book with an apparent bullet hole" and "evidence that a bullet had been fired into the living room wall." Two pistols and several loaded magazines were in a safe located in Bashir's coat closet. The pistol with a threaded barrel was compatible with the metal tube with threaded ends. Lieutenant Hornaday knew, based on his training and experience, "that oil filters and fuel filters were commonly used as homemade silencers." Officers found a bullet "in the carpet" of Bashir's bedroom; it had "agreement of class characteristics" with one of the pistols but a firearms expert could not confirm whether it had been fired by that gun.

At the therapy session during the above search, Bashir claimed he was "doing great" and "denied having any concerns or problems." Nevertheless, he acted evasively and, when pressed on instances of prior dishonesty, stated that lying was a part of his "nature." Bashir claimed that "sexual loneliness" was one of his "top" concerns; he was "frustrated" that women rejected his advances. After the therapy session, police arrested Bashir and seized his cell phone.

Given the box in Bashir's apartment that indicated he had purchased a GPS tracking device, police were concerned he had planted such a device on one of his therapists' vehicles. Subsequent investigation located "the GPS tracking device affixed to the muffler" of A.S.'s vehicle. The password for the cell phone app Bashir used to manage the GPS tracker combined A.S.'s name with the word "sexy."

Investigation of Bashir's computer revealed extensive search histories for, among other things: (1) firearms and suppressors, (2) various chemical reactions to start fires, including chlorine and brake fluid, (3) obtaining a gun without a background check, (4) oil filter suppressors, (5) how bullets are tracked back to a gun, (6) how to remove a gun's serial number, and (7) how to break a window silently. Bashir also searched for vehicle information, home

addresses, and social media accounts for the officer he shot in 2013, the female members of his treatment team, and the prosecutors and judge from his prior case.

Following the Commonwealth's proffer, the trial judge took a recess and, upon returning to the bench, informed the parties that he had been a City of Alexandria police officer 40 years earlier. The judge had contacted the Judicial Inquiry and Review Commission, which advised him his prior service in the police did not raise a conflict with this case because it was "so remote." The judge emphasized that he had "no bias one way or the other with regard to th[e] case." Bashir then moved the trial judge to recuse himself. Bashir acknowledged that there was "little to no nexus between" his cases but still had "some concern" about the judge's "ability to be impartial." The court denied the motion, emphasizing the "remoteness in time" and that he had "no feelings one way or the other about the matter."

Bashir agreed that the Commonwealth's evidence would be sufficient to convict him if the matter went to a trial. The court then accepted Bashir's pleas and, based on those pleas and the proffered evidence, convicted him on the four charges, ordered a presentence investigation report, and continued the matter for sentencing.

At the sentencing hearing, E.D., the former NGRI coordinator for the community services board, testified that she had been responsible for monitoring Bashir as he transitioned "through the hospital system and . . . into the community." She explained that people acquitted by reason of insanity are "slowly given more access to the community" when appropriate. After Bashir set a fire next to E.D.'s house, however, she changed jobs because she was not "comfortable working with clients anymore." It was "very upsetting," and she was "concerned for [her] children and . . . husband." She was perplexed about why Bashir would target her as she had "advocated in court" for his release. E.D. testified that Bashir should not be "released to the community" again because he was "really good at presenting as if he's not a threat when he's

clearly a threat to people." She did not believe there was anything "the mental health community" could do for Bashir.

K.D., who had since replaced E.D. as the NGRI coordinator, testified that Bashir never appeared "psychiatrically unstable" before or after his conditional release. After his release, he "engaged in a pattern of manipulative behavior," including "refusing to meet with male mental health staff," refusing food and water, and "feign[ing] symptoms" to be sent to a hospital where he could "be around women and better food." K.D. was concerned regarding Bashir's "unhealthy attractions to the female members of his treatment team." K.D. agreed with E.D. that "the mental health community" did not have the ability to supervise Bashir and recommended against his release to the community. She emphasized that the treatment location was not a secured building, and his treatment team could not "carry guns or tasers" or search Bashir's person when he arrived for treatment.

The trial court qualified Dr. Laura Harvatine, a psychiatrist for the community services board, as an expert in psychiatry. Dr. Harvatine testified that Bashir had been diagnosed with schizophrenia, chronic paranoid type, when he was conditionally released. But she stated that he had "never reported any" symptoms associated with schizophrenia to the treatment team, nor were any such symptoms observed by treatment providers after his release. Dr. Harvatine opined that Bashir "met the criteria" for antisocial personality disorder, which is characterized by "a lack of regard for others," "willful deception," and "behaviors that often result in criminal activity." She emphasized Bashir's compulsive lying and behavior that hurt others without any indication of remorse or guilt. Dr. Harvatine believed that Bashir was a "danger to females" and that the community services board had no services that could help him. She opined that if released, he would "pose a risk of danger to others in the community, particularly anyone involved in his treatment or legal process."

Finally, the officer whom Bashir shot in the head in 2013 testified at the sentencing hearing. He became concerned for his safety and the safety of his family after learning that Bashir had purchased two firearms and had searched for the officer's personal information on the internet. The officer did not want Bashir to know where he lived and was "concern[ed]" that Bashir would be "released back into the community."

In argument, the Commonwealth asked the trial court to impose the maximum punishment for each offense, including life imprisonment for arson. It asserted that Bashir's offenses were "devious, cunning, and evil" actions stemming from "[r]ejection by the female members of his treatment team." Bashir's compulsive lying, purchase of a firearm by a private sale, and internet search history revealed a mind intent on locating, exploiting, and harming vulnerable targets. The Commonwealth warned that Bashir's dangerous behavior would continue if he was released into the community. Given the totality of the circumstances, the Commonwealth concluded that Bashir had "forfeited the privilege to live in our society" and asked the court to not "risk the lives of everyone involved in th[e] case."

Bashir countered that this was a "mental health case" as demonstrated by his diagnoses and treatment history. Instead of considering "what may occur," he asked the court to look at what "actually occurred" and suggested that when the facts were so viewed, the discretionary sentencing guidelines were appropriate. Bashir argued that it would be "wholly inappropriate" to "lock" him up and "throw away the key," as if he had "no redeeming qualities and no place amongst . . . civilized society," or to disregard his mental health issues. He asserted that life imprisonment would not solve the problem and that the court should consider probation as an alternative. Bashir emphasized that the probation officer could search his person, arrest him, and punish him for misconduct, thus mitigating the victims' concerns. He requested that the court fashion a sentence that addressed his lingering mental health problems and provided appropriate

treatment.  In allocution, Bashir stated that he felt "bad for what happened" and "blame[d] [what happened] on the conditional release plan."  He asserted that the plan "wasn't good enough."  He said, "I should have asked for help even more, I guess."

The trial court found that Bashir's actions were "manipulative, disturbing, devious, chilling, . . . bizarre, dangerous, evil, and troubling."  The court adjudged that Bashir "knew what was expected of him . . . to stay on conditional release" and emphasized that his actions were borne from the victims' rejections of his advances.  The court ruled that Bashir persistently chose to lie, including about his symptoms so that he could go to a hospital "where there [we]re women."  After reviewing all the circumstances, including the witness testimony and Bashir's blaming his offenses on the "conditional release plan," the court found that rehabilitation was not appropriate.  Moreover, it found that the discretionary sentencing guidelines were "wholly inadequate to address the serious nature of [Bashir's] behavior and the facts of the case."  The court stated that Bashir was "dangerous" and "nothing but incarceration [wa]s [appropriate or] sufficient to protect the public."  Accordingly, the court imposed life imprisonment for arson, 10 years for providing a false statement on the firearm purchase form, 12 months for possession of a firearm by a person acquitted of a felony by reason of insanity, and a $500 fine for the unauthorized use of an electronic tracking device.  Bashir appeals.

ANALYSIS

I.  Recusal

Bashir argues that the trial judge abused his discretion by refusing to recuse himself "based on actual and perceived biases and prejudice," based on his disclosure that he was a City of Alexandria police officer 40 years before this prosecution.  He notes that one of the witnesses at the sentencing hearing, the victim of the charge for which Bashir was found not guilty by reason of insanity in 2013, had been a City of Alexandria police officer as well.  He contends

that the trial judge's decision was inconsistent with the Canons of Judicial Conduct, though he does not cite any specific canon or explain why, in his view, they required recusal. He concludes that the judge's bias was "reflected" in the significant sentence he ultimately imposed.

Recusal decisions are reviewed for an abuse of discretion. *Prieto v. Commonwealth*, 283 Va. 149, 163 (2012). A "trial court must exercise 'not an arbitrary discretion, but a sound judicial discretion.'" *Commonwealth v. Duse*, 295 Va. 1, 7 (2018) (quoting *Judd v. Commonwealth*, 146 Va. 276, 277 (1926)). On appeal, we "show enough deference to a primary decisionmaker's judgment that the court does not reverse merely because the reviewing court would have come to a [different] result in the first instance." *Id.* (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

A judge "must possess neither actual nor apparent bias against a party, and 'in the most extreme cases' of bias . . . , the judge's recusal will be required." *Billips v. Commonwealth*, 48 Va. App. 278, 291 (2006) (quoting *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003)), *rev'd on other grounds*, 274 Va. 805 (2007). Canon 1(D)(1) of the Canons of Judicial Conduct states that "[a] judge must recuse himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." *See also Wilson v. Commonwealth*, 272 Va. 19, 28 (2006) (providing "that the Canons of Judicial Conduct are instructive, although not determinative in our review of a judge's recusal decision"). A trial judge's impartiality can reasonably be questioned when "he or she possesses such bias or prejudice that would deny a litigant a fair trial." *Id.* Moreover, in deciding a recusal motion, "the judge must be guided not only by the true state of his impartiality, but also by the public perception of his fairness, in order that public confidence in the integrity of the judiciary may be maintained." *Prieto*, 283 Va. at 163 (quoting *Wilson*, 272 Va. at 28). The party moving for recusal "has the burden of proving

- 10 -

the judge's bias or prejudice." *Commonwealth v. Jackson*, 267 Va. 226, 229 (2004). "In the absence of proof of actual bias, recusal is properly within the discretion of the trial judge." *Id.*

Here, Bashir has not met his burden of showing that the trial judge was partial, biased, or prejudiced against him, nor has he shown that his sentencing hearing was unfair. Even judges who were former Commonwealth's attorneys are not required to recuse themselves from cases involving their prior office and, indeed, need not even disclose their prior employment to the parties after one year of separation. Canon of Judicial Conduct 1(D)(10)(c). Such a principle applies with added force in this case, where the judge was a police officer, not a prosecutor, *40 years* before the present case. Moreover, in asking the judge to recuse himself, Bashir acknowledged there was "little to no nexus" between the 2013 shooting of the police officer and the present charges. Boiled to its essence, Bashir's argument amounts to faulty post hoc reasoning: the judge must have been biased because he imposed substantial incarceration. That argument ignores the significant aggravating circumstances in this case and fails to demonstrate that the trial judge abused his discretion by denying the motion to recuse himself.

## II. Sentencing

Bashir argues that his sentence was "so grossly disproportionate to [his criminal] conduct" that it amounted "to cruel and unusual punishment." He contends that he accepted responsibility for his offenses, which amounted to

> setting a small fire at the home of one of his treatment providers
> which was timely extinguished so as to not cause damage,
> purchasing a firearm by means of deception, . . . knowingly
> possessing a firearm after previously being found not guilty by
> reason of insanity[,] and[] placing a tracking device on the vehicle of
> one of his treatment providers.

He maintains that his sentence so exceeded the discretionary sentencing guidelines and was so "disproportionate to comparable offenses . . . that [it] shocks the consc[ience]."

The Eighth Amendment to the United States Constitution and Article I, Section 9 of the Virginia Constitution protect against the infliction of "cruel and unusual punishments."[3]  These cruel and unusual punishments provisions are "directed, not only against punishments which inflict torture, 'but against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged.'"  *Harmelin v. Michigan*, 501 U.S. 957, 991 (1991) (quoting *Weems v. United States*, 217 U.S. 349, 371 (1910)).  Thus, the prohibition on cruel and unusual punishments "contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'"  *Ewing v. California*, 538 U.S. 11, 20 (2003) (quoting *Harmelin*, 501 U.S. at 996-97 (Kennedy, J., concurring in part and concurring in the judgment)).  "But 'outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.'"  *Id.* at 21 (quoting *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)).  "Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals."  *Solem v. Helm*, 463 U.S. 277, 290 (1983).  "Our traditional deference to legislative policy choices finds a corollary in the principle that the Constitution 'does not mandate adoption of any one penological theory.'"  *Ewing*, 538 U.S. at 25 (quoting *Harmelin*, 501 U.S. at 999 (Kennedy, J., concurring in part and concurring in the judgment)).

---

[3] Though Bashir raises his claims under the Constitutions of both the United States and Virginia, he fails to cite any authority or provide argument that the Virginia Constitution provides any broader relief than the federal one.  Accordingly, we assume without deciding that the two standards are the same in this context.  *Cf. Hart v. Commonwealth*, 131 Va. 726, 743 (1921) (noting that the two provisions are "practically in the same language"); *Dunaway v. Commonwealth*, 52 Va. App. 281, 311 (2008) (evaluating appellant's claims under the federal constitution when appellant failed to show "that Virginia's Constitution affords more relief than the United States Constitution"); *Dep't of Pro. & Occupational Regul., Bd. for Asbestos & Lead v. Abateco Servs., Inc.*, 33 Va. App. 473, 483 (2000) (adopting the federal "gross disproportionality" test for claims under the excessive fines clause of Article I, Section 9 of the Virginia Constitution).

Given our deference to the legislature and the narrowness of the proportionality principle, we do not undertake proportionality review in cases that do not involve life sentences without the possibility of parole. *Cole v. Commonwealth*, 58 Va. App. 642, 654 (2011). Bashir was not sentenced to life imprisonment on his convictions for unauthorized use of a tracking device, possessing a firearm after being acquitted by reason of insanity, or making a false statement on a firearm purchase form. Thus, proportionality review is unavailable for those sentences. Moreover, although Bashir was sentenced to life imprisonment on his arson conviction, he is eligible for geriatric release under Code § 53.1-40.01, which provides that a person serving a sentence for a felony other than a Class 1 felony "(i) who has reached the age of sixty-five or older and who has served at least five years of the sentence imposed or (ii) who has reached the age of sixty or older and who has served at least ten years of the sentence imposed may petition the Parole Board for conditional release."

"[T]he possibility of geriatric release under Code § 53.1-40.01 provides a meaningful opportunity for release that is akin to parole." *Johnson v. Commonwealth*, 292 Va. 772, 781 (2016). Bashir's arson conviction is not classified as a Class 1 felony, so he will be eligible for geriatric release under Code § 53.1-40.01. *See* Code § 18.2-77(A). Thus, "it is readily apparent that" Bashir "was only sentenced to life in prison; he was not sentenced to life without parole." *Johnson*, 292 Va. at 781. We therefore decline to conduct a proportionality review in this case. *See Cole*, 58 Va. App. at 654.

Finally, it is well-established that "when a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)). "[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate

- 13 -

review is at an end." *Thomason v. Commonwealth*, 69 Va. App. 89, 99 (2018) (quoting *Minh Duy Du*, 292 Va. at 565). Here, Bashir's sentences were within the sentencing ranges set by the legislature. *See* Code §§ 18.2-10, 18.2-11, 18.2-60.5(A), 18.2-77(A), 18.2-308.1:1(A), 18.2-308.2:2(K). And although Bashir's aggregate sentence exceeded the discretionary sentencing guidelines, those guidelines "are advisory only and do not require trial courts to impose specific sentences." *Runyon v. Commonwealth*, 29 Va. App. 573, 577-78 (1999). A judge's failure to follow the sentencing guidelines is not "reviewable on appeal" and cannot serve as "the basis of any other post-conviction relief." Code § 19.2-298.01(F).

"Criminal sentencing decisions are among the most difficult judgment calls trial judges face." *Minh Duy Du*, 292 Va. at 563. "Because this task is so difficult, it must rest heavily on judges closest to the facts of the case—those hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *Id.* The record demonstrates that the trial court heard and considered extensive evidence in this case. The court noted hearing the following words throughout the testimony to describe Bashir's conduct: "manipulative, disturbing, devious, chilling, planning, bizarre, dangerous, evil, and troubling." After considering that evidence, the court did not abuse its discretion when it concluded that Bashir was dangerous and that "nothing but incarceration" was "[appropriate or] sufficient to protect the public." *See Gilliam v. Commonwealth*, 21 Va. App. 519, 524 (1996) (providing that "incapacitation" is one of "the criminal justice system's goals" (quoting *United States v. Morris*, 837 F. Supp. 726, 729 (E.D. Va. 1993))). The trial court imposed the sentence it deemed appropriate, that sentence "does not exceed [the statutory] maximum," and our task is complete. *Smith v. Commonwealth*, 27 Va. App. 357, 364 (1998); *see also Thomason*, 69 Va. App. at 99 ("Appellant's sentence was within the statutory range, and our task is complete.").

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*